# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF WORCESTER, OCTOBER TERM 1838, AT WORCESTER.

PRESENT :

Hon. LEMUEL SHAW, Chief Justice,
Hon. SAMUEL S. WILDE,
Hon. MARCUS MORTON, } Justices.
Hon. CHARLES A. DEWEY,

## John Claflin Junior *versus* William Godfrey

A note and mortgage for $4500 having been made by P. to F., P. agreed to pay the debt in goods, and the plaintiff gave his note to F. as collateral security for the performance of P.'s agreement ; whereupon the first note and the mortgage were transferred to the plaintiff for his security. P. paid F. according to the agreement, and the plaintiff's note was given up, and the first note and mortgage were transferred by the plaintiff to the defendant, the mortgage being supposed to be a good subsisting security, to be held by the defendant as collateral security for $756 due to him from P., and to indemnify him against his liability to a bank on a note signed by P. as principal and the defendant and another as sureties ; and subsequently the defendant assigned the note for $4500 and the mortgage, to the bank, as collateral security for the note held by the bank. P. made a second mortgage of the land to one W. The right in equity of P. to redeem was taken on execution and sold for $2000 to the plaintiff, the defendant, and one C., who had agreed together to become owners of the land and to remove the incumbrances. The officer stated, at the time of the sale, that the sum due on the mortgage to W. was less than $2000. P. then conveyed his right to redeem from the sale on execution, to the plaintiff, the defendant, and C, for $300, they also agreeing to pay the debt to the bank. They accordingly paid that debt by giving their joint and several note to the bank, which they afterwards paid, one third each, and the plaintiff and C. each paid one third of the sum of $756 due to the defendant. The bank then re-transferred the note for $4500 and the mortgage, to

the defendant, and he assigned two thirds of the same note and mortgage to the plaintiff and C., in consideration of the sums paid by them to the bank and to the defendant.  W. afterwards defeated this mortgage on the ground that it had been paid ; and his claim under his own mortgage, instead of *being less than* $2000, turned out to be more than the whole value of the land.  In assumpsit by the plaintiff against the defendant, for money had and received and money paid, it was *held*, that the plaintiff was not entitled to recover one third f $300 paid to P., nor one third of $2000 paid for the equity of redemption sold on execution, but that he was entitled, on the ground of a failure of consideration, to recover one third of the sums paid to the bank and to the defendant.

ASSUMPSIT to recover the sum of $1722·77, with interest from June 17, 1833.

The plaintiff proved, that on April 4, 1828, Stephen R. Parkhurst, Nathan Parkhurst, and Parmenas P. Parkhurst, copartners under the firm of Stephen R. Parkhurst & Co., made their promissory note to John Farnum, in the sum of $4500, and at the same time executed and delivered to him, as security for the note, a mortgage of real estate, by them owned, situate in Milford.  The real estate was then subject to two mortgages, one to D. Waldo, to secure the payment of $200, the other to R. Waldo, to secure the payment of $1000.

On July 3, 1830, Stephen R. Parkhurst, in behalf of himself and Nathan and Parmenas, agreed with Farnum, in lieu of the note for $4500, to deliver to him, within six months, 4000 yards of satinet, and to give him security therefor ; and in pursuance of this agreement Stephen procured Claflin, the plaintiff, to give his note to Farnum for the satinet.  Farnum thereupon transferred to the plaintiff the note for $4500, by indorsing it without recourse to himself, and at the same time assigned to the plaintiff the mortgage given as collateral security for the note.  Before the 5th of November then next, Parkhurst & Co. paid the note given by the plaintiff to Farnum, and afterwards, on or before that day, delivered the same to Godfrey, the defendant.

On the same 5th of November, Parkhurst & Co. and the defendant had a reference of various matters between them, the plaintiff being one of the arbitrators ; and upon the hearing before the arbitrators it was ascertained and admitted, among other things, that the defendant was then liable as surety for

<div align="right">
</div>

Parkhurst & Co. to the Mendon bank, for the sum of $4000, on a note made by Parkhurst & Co. as principals and the defendant and one Ithiel Parkhurst as sureties ; and that there was due to the defendant from Parkhurst & Co. the sum of $1801·06. The defendant had other claims against Parkhurst & Co. and was under other liabilities on their account, as security for which he held two mortgages.

At the hearing before the arbitrators, the defendant produced the note given by the plaintiff to Farnum, and it was stated by Stephen R. Parkhurst and the defendant, before the arbitrators, the plaintiff being present and hearing the statement, that the satinet with which Parkhurst & Co. had paid Farnum, was made of wool furnished by the defendant under a certain contract, dated March 6, 1830. and that therefore the defendant was to have the benefit of the mortgage made to Farnum. Stephen then agreed with the defendant, that the note given by the plaintiff to Farnum should be given up by the defendant to the plaintiff, and that the note and mortgage for $4500, should be assigned by the plaintiff to the defendant, to be held by the defendant as further security on account of his claims and liabilities ; and thereupon the plaintiff, upon receiving his note from the defendant, transferred to the defendant the note and mortgage for $4500, indorsing the note without recourse.

After the arbitrators had made their award, they were requested to apportion the several claims and liabilities of the defendant, upon and among the three mortgages held by him, and in compliance with such request they directed, that he should hold the Farnum mortgage to indemnify him against his liability as surety on the note for $4000 to the Mendon bank, and as security for the payment of $756, part of the sum found due to him on account. He thereupon agreed to hold the Farnum mortgage for that purpose and no other, and gave a bond to Stephen to that effect. On November 12, 1831, the defendant transferred the note and mortgage for $4500, to the Mendon bank, to be held by the bank as collateral security for the payment of the note of $4000, on which the defendant was a surety.

On November 12, 1831, Stephen, Nathan and Parmenas

again mortgaged the same real estate to William Whitney, to secure the payment of all such advances and claims as he might have against Parkhurst & Co.

In January, 1833, the right in equity of Stephen, Nathan and Parmenas, to redeem the same real estate was taken on an execution in favor of a creditor, and the plaintiff and Lee Claflin and the defendant, agreed to become the joint purchasers, provided they could obtain it for a certain price ; and on February 25, 1833, it was sold to them for $2000, and on the same day a deed thereof was duly made to them by the officer. Among the incumbrances on the estate, subject to which the equity of redemption was sold, the Farnum mortgage was mentioned by the officer, at the sale and in his deed. He also mentioned the Whitney mortgage, and stated that the amount due thereon was less than $2000. It was a part of the agreement between the plaintiff and defendant and Lee Claflin, that the Farnum mortgage should be relieved from the claim of the Mendon bank, by the payment of the note for $4000, and that the assignment to the bank, which had not been recorded, should be cancelled, and that the defendant should convey one third of the mortgage to the plaintiff and one third to Lee Claflin.

Stephen R. Parkhurst, by conveyances from Nathan and Parmenas, had become the sole owner of the right to redeem from the sale on execution, and on March 6, 1833, in consideration of $300 paid him by the plaintiff, the defendant and Lee Claflin, he quitclaimed to them all his right, title and interest in the estate, they agreeing to take up the note for $4000 to the Mendon bank.

On June 17, 1833, the plaintiff and Lee Claflin each paid to the defendant one third part of the amount due on the note for $4000, by giving with the defendant their joint and several note therefor to the bank, which note has since been paid by them in equal portions ; and the plaintiff and Lee Claflin also paid each one third part of the sum of $756, with interest thereon, by cash paid to the defendant ; the third part of both sums amounting to $1722·77. The bank thereupon gave up the note for $4000, and the note for $4500, and cancelled the deed of assignment made by the defendant to the bank,

of the Farnum mortgage, intending thereby to revest in the defendant whatever estate he had at the time of making the assignment, so as to enable him to assign to the plaintiff and Lee Claflin, in the manner before mentioned.

On the same 17th of June, the defendant, in consideration of the sum of $3454·54 so paid by the plaintiff and Lee Claflin, by his deed of that date transferred to them two third parts of the Farnum mortgage, and two third parts of the note for $4500 thereby secured.

Stephen, Nathan and Parmenas Parkhurst had all become insolvent before the same 17th of June, and are still insolvent.

The plaintiff proved, that after the conveyance by the defendant to the plaintiff and Lee Claflin, Whitney, in a bill in equity between him and the present plaintiff and Lee Claflin, resisted the note and mortgage for $4500, on account of the payment made by Parkhurst & Co. to Farnum, and thereby defeated the same. The claim of Whitney under his mortgage, turned out to be more than $10,000, instead of being less than $2000, as stated by the officer at the sale of the equity of redemption.

After Whitney had so defeated the note and mortgage for $4500, the plaintiff brought his present action to recover the sum of $1722·77 paid by him therefor to the defendant.

Judgment was to be entered on a nonsuit or default, according to the opinion of the Court upon the foregoing facts.

*Newton* and *Merrick*, for the plaintiff.

*C. Allen* and *Washburn*, for the defendant, argued that the plaintiff had paid the money under a mistake of law, with a knowledge or means of knowledge of the facts, and therefore that it could not be recovered back ; that he had received everything that he had bought, having with the defendant purchased subject to Whitney's mortgage. *Gates* v. *Winslow*, 1 Mass. R. 66 ; *Herbert* v. *Champion*, 1 Campb. 134 ; *Brisbane* v. *Dacres*, 5 Taunt. 143 ; 1 Story on Eq. 121 to 153, 161, 163, 164 ; 2 Stark. Evid. (4th Amer. ed.) 112 ; Chit. Contr. 190 ; Roscoe on Evid. 230 ; *Stevens* v. *Lynch*, 12 East, 38, and Day's note ; *Bilbie* v. *Lumley*, 2 East, 469 ; *Mowatt* v. *Wright*, 1 Wendell, 360 ; *Gloucester Bank* v. *Salem Bank*, 17 Mass R. 42 ; *Ellis* v. *Wild*,

Claflin
*v.*
Godfrey.

6 Mass. R. 321 ; *Seaman* v. *Price*, 2 Bingh. 437 ; *Bree* v *Holbech*, 2 Doug. 655 ; *Dorsey* v. *Jackman*, 1 Serg. & R. 42 ; *Cunningham* v. *Spier*, 13 Johns. R. 392.

The opinion of the Court (*Shaw* C. J. and *Dewey* J. dissenting), was delivered by

Oct. 8th,
1838.

MORTON J. We have bestowed unusual labor and care upon this case, and with our best efforts have found some difficulty in understanding the very complicated state of the facts, and stil' more, in applying to them the principles of law by which the rights of the parties should be determined. We have the more carefully investigated the subject, because there has been from the beginning a difference of opinion among the members of the Court. And I regret to add, that with our most earnest endeavours we have not been able to unite in the result which I am now about to announce.

The action is assumpsit for money had and received by the defendant to the plaintiff's use, and for money paid by the plaintiff for the defendant's benefit. This is often called an equitable action and is less restricted and fettered by technica. rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which *ex æquo et bono* belongs to the plaintiff. It was encouraged and, to a great extent, brought into use by that great and just judge, Lord *Mansfield*, and from his day to the present, has been constantly resorted to in all cases coming within its broad principles. It approaches nearer to a bill in equity than any other common law action ; and indeed has many of the advantages, without the artificial formalities and dilatory proceedings, of a chancery suit. *Moses* v. *Macferlan*, 2 Burr. 1012 ; *Straton* v. *Rastall*, 2 T. R. 370 ; *Roland* v. *Hall*, 1 Hodges, 111 ; *S. C.* 1 Scott, 539 ; *Parry* v. *Roberts*, 3 Adolph. & Ellis, 118 ; *S. C.* 5 Nev. & Manning, 663 ; 1 Leigh's N. P. 44.

The plaintiff's claim grows out of a transaction in which all the parties concerned were involved in a series of gross mistakes and errors, which brought upon them great pecuniary suffering. The object of the present suit is to determine, as far as practicable, upon whom the losses shall fall, and how they shall be apportioned. The mistakes were accidental, and

there is no reason to suppose that any misrepresentation or deception was attempted or practised by either party.

We have therefore to determine who of the innocent sufferers shall sustain a particular loss growing out of the misfortunes of a joint speculation.

It will be impossible to discuss this question without adverting to and examining the claims of a person who is not a party to the suit, who has not been heard and who therefore cannot be bound by our judgment. Lee Claflin has upon the docket an action founded upon the same transaction, and which probably will depend upon the same facts and principles as the case at bar. We cannot therefore proceed in the investigation without canvassing the claims, liabilities and rights of all the persons engaged in the disastrous speculation.

Early in the year 1833, the right in equity of redeeming certain real estate in Milford was advertised for sale on execution. John Claflin, the plaintiff, Lee Claflin, and William Godfrey, the defendant, agreed to become the joint purchasers, provided they could obtain it for a price which they had agreed upon. Accordingly, on February 25, 1833, they bid off the equity for the sum of two thousand dollars, which was paid equally by the three, and took a joint deed of the whole. At the auction the officer represented, that the incumbrances to which the estate was subject, consisted of two mortgages to D. and R. Waldo, one originally given to John Farnum, and one to W. Whitney, upon which less than two thousand dollars were due. But it was afterwards discovered that, instead of *two thousand*, over *ten thousand* dollars were due upon the Whitney mortgage. This amount, with the Waldo mortgages, greatly exceeded the value of the estate, so that it became inexpedient to redeem it, and the purchasers lost the whole consideration paid for the equity of redemption. There can be no doubt that, by the principles of law and equity, this loss must fall equally upon the parties. But this was only the beginning of the errors and losses, into which this unfortunate transaction led them.

In 1828, Stephen R. Parkhurst & Co., who were the owners of the real estate aforesaid, mortgaged it to John Farnum to secure the payment of $4500. Farnum assigned

Claflin
*v.*
Godfrey.

the mortgage to John Claflin the plaintiff, to secure him for his liability to Farnum as the surety of Parkhurst & Co. Afterwards John Claflin, having been relieved from his suretyship, at the joint request of Godfrey and Parkhurst & Co., and without receiving any consideration from either, assigned the mortgage to Godfrey. This assignment was procured by Parkhurst & Co. to secure Godfrey for his liability for them to the Mendon bank, on a note of $4000. Godfrey again assigned the mortgage to the bank as collateral security for the above note, which he had signed as surety.

In this state was this mortgage, when the Claflins and Godfrey agreed to purchase the equity of redemption. It was a part of their agreement, that this mortgage should be relieved from the claim of the Mendon bank by the payment of the note for which it was holden as collateral security ; and that the assignment to the bank, which never had been recorded, should be cancelled, and that Godfrey, who would thus be restored to his rights as holder of the mortgage, should convey to each of the Claflins one third of it, so that the three should become equally interested in it.

In pursuance of this agreement, " on the 17th of June, 1833, the Claflins each paid to Godfrey one third of the amount due " to the bank, and the whole being paid the note was taken up and delivered to Godfrey, and the assignment to the bank cancelled. The mortgage having, as the parties supposed, revested in Godfrey, he made an assignment of two thirds of it to the Claflins, thereby vesting in each of the three an equal interest in the mortgage.

The payment to the bank was made, in the first instance, by three equal notes, for the amount, given jointly and severally by the three parties. When these notes became due, each party paid one of them. So that the payment is not to be deemed a joint act of the three, but a several payment by each, of one third of the amount. And the three notes should be considered as the several notes of the parties, two, in each case, being sureties for the other.

Soon after this transaction, it was ascertained, and decided by this Court, in a bill in equity between Whitney and their assignees, that the payment to Farnum of the debt which the

mortgage was originally made to secure, operated in law as a discharge of the mortgage, which thereby became *functus officio.* So that all the subsequent formal transfers were inoperative, and passed nothing.

The conveyance by Godfrey to the Claflins having entirely failed, it would seem that they ought to recover back the consideration which they paid. They parted with their money, for what all parties, at the time, supposed to exist and have value. But it proved to be valueless ; to be, in fact, a nonentity. Godfrey parted with nothing of any value. He re ceived the money of the Claflins, and the plainest principles of justice require that he should restore that which he received without having given any thing in return. *Fowler* v. *Sheaver,* 7 Mass. R. 31 ; *Bond* v. *Hays,* 12 Mass. R. 34 ; *Lazell* v. *Miller,* 15 Mass. R. 207 ; *The Union Bank* v. *Bank of United States,* 3 Mass. R. 74 ; *Haven* v. *Foster,* 9 Pick. 112.

The general principle, that when the whole consideration fails, when the title is entirely nugatory, so that nothing passes by the conveyance, the purchase money may be recovered back, is unquestioned. And if no other ingredients entered into this arrangement between the parties, the plaintiff's right to a repetition of his money would be too plain to admit of doubt.

The report finds, in express words, that the Claflins paid Godfrey two thirds of the amount due to the bank. The manner in which it was done is then explained, and it is argued that it does not show a payment to Godfrey, but to the bank. It seems to us, that inasmuch as Godfrey was the person liable to the bank, — as he was to receive back the mortgage, — and he, and not the bank, was to assign it to the Claflins, the transaction should be viewed in the light of a payment to Godfrey and by him to the bank. But we do not attach great importance to this view of the subject. For we think that the plaintiff's claim is equally good, whether we consider the payment to have been made to Godfrey or, by his request, to the bank, in satisfaction of his note due there. It, in both cases, would operate equally for his benefit.

But it is further contended with plausibility, if not force,

that it was part of the original agreement between the parties, that they should not only purchase the equity of redemption, but also should buy in this outstanding mortgage, and therefore that the three parties, being equally innocent and having equal means of knowledge, must bear the loss equally. Had all the facts been as stated, and had the mortgage been in the hands of a third person, instead of one of the purchasers, the loss, if any were sustained, should, like the loss on the purchase of the equity, fall equally upon all. But it may be said in reply, and we think it unanswerable, that had the mortgage been in other hands, upon the failure of the assignment, the money might have been recovered back. Why should the Claflins be placed in a worse condition than if they had purchased the mortgage of a third person? Can the defendant have any greater rights against the plaintiff, than a stranger would have? We think not.

Nor can we perceive that the relation which the defendant bears to the bank debt, affects the respective rights of the parties. It is true Godfrey had signed the note only as surety It was for the debt of Parkhurst & Co. ; but he was bound to pay the debt. And it can make no difference to the Claflins, whether he had incurred this liability on his own account or for another.

But it is further contended, that the Claflins and Godfrey contracted with Stephen R. Parkhurst to purchase in his right to redeem from the sale of the equity as well as from the mortgages ; and that a part of the consideration of this purchase, was the agreement to pay the above note to the Mendon bank ; that the conveyance having been made upon this consideration, Godfrey was deprived of his remedy over against his principals, and also against his co-surety for contribution. This objection certainly has great weight and constitutes the principal difficulty in the case. But we think it is not insuperable.

The facts in relation to this point appear to be the following. The Claflins and Godfrey, after the purchase of the equity of redemption, at the sheriff's sale, in pursuance of their original plan to become the owners of the Milford estate, and to perfect their title to it, agreed to purchase of Parkhurst all his

right to redeem the estate, and accordingly completed a contract with him to that effect. To induce Parkhurst to convey the right of redemption, which remained to him, the Claflins and Godfrey agreed to pay him three hundred dollars and to take up the note at the Mendon bank. In execution of this agreement Parkhurst, on the 6th of March, 1833, made a deed of quitclaim to the Claflins and Godfrey, who at the same time paid him the three hundred dollars, and afterwards, in the manner above stated, took up the Mendon bank note.

We do not doubt that the real consideration of the release of the equity was the payment of the note as well as the cash. As to the money paid, there can be no ground for contribution. It was a payment upon a joint speculation, and if it turned out to be a bad one, the loss must be borne equally by the parties. If they have any remedy, it must be against Parkhurst, to recover back money paid to him under a mistake ; but neither can have a right to throw upon his associates an undue proportion of the common loss.

Does the payment to the Mendon bank stand on the same footing ? If the parties, without misapprehension and with a knowledge of all the facts, had made this contract, although in its operation it had relieved Godfrey at the expense of the Claflins, it would unquestionably have been valid and have laid no foundation for a repetition of the money paid, nor for a contribution between the sufferers. It would have stood upon the same ground as the contract with Parkhurst, and the purchase at the sheriff's sale. If this agreement with Parkhurst to pay the bank debt was an obligatory one, it would discharge the Parkhursts from their liability over to Godfrey. And if Godfrey was deprived of his right to recover of his principals and co-surety, it would be very unjust to throw upon him the loss incurred by the joint acts of the three, and to relieve the other two of their share of the common responsibility.

Nor is the circumstance that the Parkhursts were and are entirely insolvent, any answer to this view of the subject. It cannot be known that they will not become able to reimburse Godfrey. But further, the legal rights and liabilities of parties do not depend upon their pecuniary ability to perform their contracts  And if this arrangement operated so as to deprive

Claflin
v.
Godfrey.

Godfrey of his remedy against his principals and co-surety, then we can see no good reason why the whole amount paid to the bank should be thrown upon him, rather than divided between the parties.

But a majority of the Court is of opinion that such was not the legal effect of this transaction. All the parties acted under a total misapprehension of all the material facts in the case, as well as of their own legal rights and liabilities. No fraud enters into our consideration; every thing was perfectly fair; but all the persons concerned in the several contracts were equally misinformed and acted under the same errors in relation to the principal subjects of the negotiations.

In making the contract to purchase the last right of redemption, the Claflins and Godfrey on the one side, and the Parkhursts on the other, fully believed and acted on the conviction that Whitney's incumbrance was less than $2000, whereas it exceeded $10,000; and what is more important, that the Farnum mortgage was a valid lien upon the estate, taking precedence of Whitney's mortgage, and being certainly worth its face, whereas, in fact, it had no legal existence and had no value. Now had these facts been known to the parties at the time, they never would have made the contracts they did. It is impossible to suppose that the Claflins would have agreed to pay several thousand dollars for what they knew had no validity or value and could in no event be of any avail to them.

The whole basis of the contracts having failed, the contracts themselves must fall, and the parties, as far as practicable, be placed in *statu quo*. They should be remitted, as far as the existing state of things will permit, to all their former rights. The purchasers of the last right of redemption may recover back the money paid for it. Godfrey may have the same remedy against his principals and co-surety which he might have had if he had made no agreement for the purchase of the equity. And the Claflins should be placed in the same situation they would have been in had they never become parties to the agreement. Had Godfrey alone purchased the equity of the sheriff, made the contract with the Parkhursts, and paid the Mendon bank note, as the three have done, we think it extremely clear that the mutual misapprehensions would have

avoided the contract, and that he would have been restored to all his rights against the Parkhursts and other parties to the transaction.

Had the Farnum mortgage been holden by a stranger instead of Godfrey and the contract been with him for the assignment of it, the consideration undoubtedly might have been recovered back. It would have been like the purchase of a forged mortgage or counterfeit bank bills. There would have been an entire failure of the contract. Or had the Claflins made a contract with the bank for the purchase of two thirds of the mortgage and had the bank assigned to them, we cannot doubt that they might have recovered back the consideration which they paid for it. And we can perceive no reason why the principle should not apply to the case at bar, unless the arrangement under consideration operated as a discharge of the Parkhursts from their liability over to Godfrey. This we have endeavoured to show was not the case. If Godfrey intended to discharge the Parkhursts, or if he supposed that such would be the legal effect of these acts, it was because he believed that he received something of value from them. But inasmuch as he received nothing, no discharge can be implied, nor is there any consideration which would support an express one.

It was undoubtedly the clear understanding of all the parties, that the plaintiff should receive and become the legal owner of one third of the Farnum mortgage. This was the consideration for which he paid his money. But contrary to the honest belief of all, this proved to be a legal nullity. The plaintiff acquired nothing. He paid his money and for it received nothing in return. Upon the plainest principles of right, therefore, the consideration should be restored to him. Nor would this operate unjustly upon the defendant. He supposed that he had something of value, and undertook to transfer it to the plaintiff. But it turned out that it had no legal existence, and that he had transferred nothing. Having, by misapprehension, got something without parting with any thing, why should he not restore? He not only conveyed nothing, but he lost nothing. If he restores what he received, he will be in as good a situation as if he never had received it. He has paid, with the aid of the Claflins, a debt which he would have been

obliged to pay himself, had they not interfered. He has now the same means of indemnity against others which he would have had in that case. Let the Claflins recover back the money which they paid, and it will be the nearest practicable approximation to a restoration of the parties to their original rights

It cannot properly be objected to this view of the case, that the parties contracted with a full knowledge of all the facts, and that the mistakes arose altogether from a misapprehension of the law. We shall not here enter into a discussion of the vexed question, whether money paid by mistake of law can be recovered back, because we do not think that the doctrine, if sound, applies. See *Haven* v. *Foster*, 9 Pick. 112. Here was a total misapprehension of every thing material to the subject of negotiation. The plaintiff strives to reclaim the consideration of a contract which never had any legal force or effect. The general principle is well settled, that when the consideration totally fails, where nothing passes by the attempted transfer or conveyance, the amount paid may be recovered back. And the application of the principle does not at all depend upon the question, whether the failure arose from ignorance of law or of fact.

In relation to the payment to Godfrey of one third of the amount due from the Parkhursts to him, all the Court are of opinion that the plaintiff is entitled to recover. This was not included in the agreement with the Parkhursts. It was a part of the consideration paid by the plaintiff for his part of the Farnum mortgage. And as he received nothing for the money paid, and as the transaction can have no unfavorable effect upon Godfrey's claim upon his debtors, we think that he must recover this sum. And notwithstanding the many circumstances which tend to distinguish the two grounds of claim, a majority of us are of opinion, that when thoroughly sifted and placed upon their true merits, they both rest upon the same equitable basis, and are alike compatible with sound principles of law.

There is also another short and general view of the subject, which we think fairly and clearly exhibits the substantial justice of the plaintiff's claim.

The two Claflins and Godfrey engaged in a joint enterprise,

in which they were equally interested. Had it proved fortunate, they would have shared equally in its advantages. It proved disastrous. Common justice therefore required that they should bear equally the common misfortune. But unless the plaintiff may recover in this action, the Claflins would not only sustain the whole loss, but Godfrey would actually be enriched, by a speculation which caused a great loss to the common concern. Godfrey had a debt due to himself, and also owed a debt as surety to the Mendon bank, two thirds of both of which the Claflins have paid. As the Parkhursts were insolvent, the former would have remained unpaid and the latter must have been paid by Godfrey. Now unless he be holden to repay to the Claflins the amount paid by them to him, he will make a clear profit of the money thus received. deducting only the amount which he paid for the two equities ; while the two Claflins will not only lose the sums paid for the equities, but also the amount paid to Godfrey. This cannot be equal justice. But if Godfrey repay to the Claflins the amount received of them, then he will be in the same situation he would have been in had the Claflins paid him nothing. He will have his claim against the Parkhursts for their debt due to him, and for the money he has been obliged to pay for them by reason of having become their surety.

The defendant is to be defaulted and judgment is to be entered for the plaintiff for both sums, with interest from the time of payment.

SHAW C. J. It is with regret that I find myself constrained to dissent from the opinion, to which a majority of the Court have come in the present case ; but after a good deal of discussion and consideration, not having been able to concur with them in that opinion, I have thought it best briefly to state the grounds, upon which my own has been formed. After all, however, it will probably appear, that the difference of opinion arises more from the difference of views taken of the evidence, and of the facts which that evidence establishes, than respecting the rules of law applicable to those facts, when fully understood.

But so numerous and complicated are the facts and so various the names, dates, and particular circumstances enumerated as

Claflin
v.
Godfrey.

bearing on the case, that it is difficult to comprehend the true merits of the question. We are now to take it as settled, because it has been so adjudged, and is so found in the agreed statement of facts, that the Farnum note and mortgage had been paid and satisfied by the Parkhursts, the makers ; that it was held as collateral security by Claflin, to indemnify him against his liability as surety for the performance of the sub-stituted contract made by the Parkhursts to Farnum ; and when they had performed that substituted contract, that per-formance paid and discharged the note and mortgage, and also discharged Claflin from his liability as such surety. This question was fully considered upon all the evidence, in the case of *Whitney* v. *Claflin*, and it was decided that the effect of these transactions, was a payment of the note to Farnum, by which the mortgage given to secure it was in effect dis-charged. This fact lies at the foundation of the present case, that after the delivery of the satinets by Parkhurst to Farnum, both the note and mortgage given by the Parkhursts to Farnum, and the note given by Claflin to Farnum as surety for Park-hursts, for the delivery of the satinets, were paid and satisfied and of course became inoperative and void. But under a mutual mistake both of law and of fact, the parties considered this mortgage as a good subsisting security, and as such it was transferred by Claflin to Godfrey, to hold as collateral security for debts due from the Parkhursts to Godfrey, and to indem-nify him against liabilities which he was under for them. It was subsequently arranged by certain referees, appointed to adjust various controversies between the Parkhursts and God-frey, and assented to by them, that the latter should hold it to indemnify him against a suretyship for the Parkhursts to the Mendon bank for $4000, and for the security of a debt of $756, due directly from the Parkhursts to him. Subsequently, Godfrey assigned this note and mortgage to the Mendon bank, as further security for the same note, and they became the legal holders. But it will not be necessary to recapitulate the facts minutely. After these transactions, the Parkhursts again mortgaged the same estate to Whitney, to secure future ad-vances, of course for an uncertain sum, a sum not apparent on the face of the security. Afterwards the equity of redemṇ

<div style="float:right">Claflin<br>*v.*<br>Godfrey.</div>

tion was taken as the property of Stephen Parkhurst, who had become solely interested in it, and sold on execution, and purchased by the two Claflins and Godfrey jointly. It was sold subject to existing incumbrances ; and the Farnum mortgage was treated as a good, subsisting incumbrance, and the amount of Whitney's incumbrance was understood to be only $2000, whereas in fact, as it was afterwards proved, it was upwards of $10,000, and so rendered the right of redeeming worthless. The incumbrances, independently of the Farnum mortgage, exceeded the value of the estate. The loss of the $2000 thus paid for the equity, by Godfrey and the two Claflins, being paid under a mutual mistake of the value of the equity, must of course be borne by them equally. Their next object, after purchasing the equity at the sheriff's sale, was, to get in the various incumbrances, and thus perfect their title to the estate. The first step was, to obtain of Parkhurst his personal right of redeeming the equity, thus sold, so that when they had paid off and discharged the incumbrances, they might have an absolute, instead of a defeasible title to the estate. For this purpose they entered into an agreement with Parkhurst, to pay him $300, for his right of redeeming. They at the same time agreed with him, to take up and pay the note of the Parkhursts for $4000, at the Mendon bank, being the note signed by Godfrey and Ithiel Parkhurst as sureties, without recourse to them, or to the other surety Ithiel Parkhurst. By this operation, they would obtain a discharge of the claim of the Mendon bank upon the mortgage, which stood as one of the incumbrances, which they had a mutual interest in discharging. If this was in the nature of a purchase made of the Mendon bank, or of a payment made to that bank, to extinguish the mortgage, it must be considered as made for their joint account, under a mutual mistake of its validity and value ; and proving invalid, the loss must be borne by them equally. In form it was not precisely so ; but the facts find that they gave their joint note for the $4000 to the Mendon bank, and thereupon the bank cancelled the assignment, which had not been recorded, thereby intending to revest the interest in Godfrey, as it stood before he assigned the mortgage to the bank. But independently of this, Godfrey had a resulting interest in

it, for his own debt of $756, after the debt to the bank was paid. It was then arranged in this way; the two Claflins, after joining in a note with Godfrey, for $4000, to the bank, which they afterwards paid, one third each, paid each of them to Godfrey, one third of his debt of $756, and thereupon he transferred two thirds of the note and mortgage to them, and thus let them in, to share equally with him, in the benefits of it.

Had there been no mistake in regard to the amount of Whitney's mortgage, and had Godfrey and the two Claflins proceeded to redeem, according to their original intention, when they purchased the equity at the sheriff's sale, and procured of Parkhurst a release of his right to redeem, the above transaction, between Godfrey, the Claflins, and the bank, would in effect have been but the payment of their own debt, or the extinguishment of an incumbrance, which they had a common and equal interest in extinguishing. For, as they had purchased the equity, subject amongst other incumbrances, to the Farnum mortgage held in effect by Godfrey, the interest being his, though at the time pledged to the bank for security, the Claflins would have been estopped to deny, that as between Godfrey and them, this was one of the securities to be redeemed, in order to obtain a title to the estate.

Had the effect of the agreement between Godfrey and Parkhurst been, that he Godfrey being already surety on the $4000 note to the bank, should take it up himself, by which he would have become re-invested in his title to the note and mortgage, and then as an independent transaction he had sold two thirds of this security to the two Claflins, and they had paid him for it, and it turned out to be a void security, the money must be regarded, as money paid on a consideration which had failed, and an action would lie to recover it back. And this, I am aware, is the view of the subject taken by the majority of the Court. They consider that Godfrey took up the $4000 at the Mendon bank, as surety, that thereupon they cancelled the assignment of this mortgage, which he had assigned to them as collateral security, and that the transfer of two thirds of this mortgage, to the two Claflins, was a subsequent and an independent transaction. But according to my view of the subject, the transaction will not bear this construc

*tion.* Godfrey, as I think, did not pay the note of $4000 at the bank, under his original liability as surety. Had he so done, he would not only have regained his interest and title, in the note and mortgage pledged as collateral security for that suretyship, but he would have had a claim upon the Parkhursts for indemnity, for the whole amount, as money paid to their use, and in case of their inability, upon Ithiel Parkhurst, his co-surety, for contribution. These were relinquished in consequence of the agreement made by the two Claflins and Godfrey jointly, with Parkhurst, that they would pay the note at the bank on their own account. The payment was made in pursuance of this agreement. The money, therefore, the two thirds of the note, which was paid by the two Claflins to the bank, was not, either in point of fact or in construction of law, money paid at the request of Godfrey, or for his use. On the contrary, it must be considered as money paid in pursuance of their agreement with Parkhurst, and with an ultimate view to cancel and extinguish so much of the incumbrance, on an estate which they then had an interest in redeeming, and a full purpose to redeem. This purpose was afterwards changed by a discovery of the unexpected amount of Whitney's mortgage ; this being, with previous unquestionable incumbrances, more than the value of the estate, they ceased to have an interest in redeeming, and all which they had previously paid, either for the right of redemption or for extinguishing incumbrances, must be deemed a loss to be borne equally by those who had thus paid it. And in my opinion, the sum thus paid to the Mendon bank, as a means of getting up the mortgage in question, falls under the same predicament, and is one of the losses to be thus borne. This view of the subject is strengthened by the fact, that this money was not paid by the Claflins to Godfrey, as upon a purchase by each of him of one third of the mortgage ; but it was paid directly to the bank, as the three had agreed with Parkhurst that it should be paid ; and it was not at that time the proper debt of Godfrey to the bank, but a debt for which he was conditionally liable with another surety. In my opinion, also, the note to the bank having been thus paid by Godfrey and the two Claflins by their joint note afterwards paid, in pursuance of their agreement with Park-

hurst, Godfrey had no remedy over, either against the principals or the co-surety, as he would have had, if he had paid it as surety. And it makes no difference, that Godfrey derived some separate and collateral benefit, in getting a debt paid to the Mendon bank, which he in certain events might have been obliged to pay, as surety. It was an incidental consequence of the arrangement made with the Parkhursts, on the one side, and the bank on the other, and was not the object to be accomplished by that transaction, Godfrey at the time being, equally with the Claflins, ignorant that the mortgage was not a perfectly good security to Godfrey, for his suretyship on this note for the Parkhursts. In regard to the $4000, therefore, my opinion is, that the plaintiff is not entitled to recover.

In regard to the one third of $756, the case stands upon a very different footing. When the note was surrendered up by the bank to Godfrey, it amounted nominally, including interest, to more than the note due the bank, and also the $756. As against the Claflins, Godfrey had an interest in it, to that amount, after it had been redeemed of the bank. Each paid him one third of $756, and he assigned to them two thirds of the note and mortgage, as a valid security, to which he claimed and supposed he had good title. But it subsequently appeared that he had no title. The money was paid by each of the Claflins directly to the defendant, not in extinguishment of the mortgage, but for an assignment and as upon a purchase. The consideration failed, and therefore I am of opinion that the plaintiff is entitled to recover it back in this action. As the Claflins paid each one third of this sum, the payments were several, and the plaintiff may maintain a separate action, for the sum paid by him. But conformably to the opinion of a majority of the Court, judgment is to be rendered for the larger sum.

DEWEY J. concurred in the opinion of the Chief Justice.

*Defendant defaulted.*