CARE AND PROTECTION OF INGA & others.[1]

No. 93-P-804.

Worcester. February 18, 1994. - June 15, 1994.

Present: DREBEN, KAPLAN, & GILLERMAN, JJ.

*Minor*, Care and protection. *Parent and Child*, Care and protection of minor. *Evidence*, Child custody proceeding.

In a care and protection proceeding involving three children, the judge's undisputed findings of fact did not constitute, in the aggregate, clear and convincing evidence of parental unfitness [667]; where there were serious allegations of parental sexual abuse but no findings thereon and where the report of the investigator appointed under G. L. c. 119, § 24, was dated 1990, the matter was remanded for additional investigation and hearings on the merits [667-668].

PETITION filed in the Worcester Division of the Juvenile Court Department on April 2, 1990.

The case was heard by *Luis G. Perez*, J.

*Carol A. Erskine* for the father.

*Warren M. Yanoff* for the mother.

*Richard A. Salcedo* for Department of Social Services.

*Margaret Clapp Winchester* for the minors.

GILLERMAN, J. The parents appeal from a decision of the Worcester Juvenile Court adjudging their three children in need of care and protection and committing them to the permanent custody of the Department of Social Services (the Department). See G. L. c. 119, § 24. We must decide whether the judge's subsidiary findings of fact, which the parents do not dispute,[2] constitute, in the aggregate, clear

---

[1]Charles and Alison. All names are fictitious.

[2]The parents do not concede, however, that the § 51A report described and discussed *infra*, may be considered for the truth of the matter contained in that report.

and convincing evidence of parental unfitness. See *Care and Protection of Laura*, 414 Mass. 788, 790 (1993).

The undisputed facts are, briefly, these. The parents, un-married but living together since 1985, have four children,[3] three of whom are the subject of these proceedings: Inga, Charles, and Alison.[4] The Department filed its original care and protection petition on April 2, 1990, on behalf of Inga and Charles (Alison had not yet been born). The petition was based on a report, dated March 30, 1990, filed by a physician pursuant to G. L. c. 119, § 51A (§ 51A report)[5] alleging physical abuse of Charles.[6] It indicated that he had con-

---

[3]The oldest child, born with spinal bifida, was surrendered for adoption in February, 1988, after two reports alleging neglect by his mother were filed pursuant to G. L. c. 119, § 51A.

[4]Inga was born February 6, 1987, Charles was born on January 18, 1988, and Alison was born June 19, 1990.

[5]General Laws c. 119, § 51A, requires certain professionals, who have "reasonable cause to believe" that a child under the age of eighteen is suffering from abuse or neglect, to make a written report of such conditions to the Department within forty-eight hours. "[A] presentation of facts which create a suspicion of child abuse is sufficient to trigger the requirements of § 51A." *Care and Protection of Robert*, 408 Mass. 52, 63 (1990).

Upon receipt of a § 51A report the Department must conduct an investigation and evaluation of the information contained in the § 51A report, and "such determinations and evaluations shall be in writing [§ 51B report]." See G. L. c. 119, § 51B(1). Under a Department regulation, 110 Code Mass. Regs. § 4.32 (1988), the Department will "support" a § 51A report if it has reasonable cause to believe some caretaker inflicted abuse or neglect upon a child. Further, if, as a result of the investigation and evaluation, the Department "has reasonable cause to believe" that death or serious injury has resulted from abuse or neglect, the Department must notify the district attorney in writing. G. L. c. 119, § 51B(4).

The conclusions reached by the reporting person under § 51A and by the Department under § 51B are merely "threshold determination[s]." *Care and Protection of Robert, supra* at 64. See generally Ireland, Juvenile Law §§ 108 and 232(d) (1993).

[6]The Department did not petition the court for custody until the report of March 30, 1990, was filed, although it had received two previous § 51A reports, submitted by different physicians, alleging mistreatment of Charles. The first, dated April 6, 1988, alleged neglect: Charles had "extensive thrush" (a form of yeast infection); his mother said that the then two month old Charles was "not as well-behaved as his sister"; and his father stated that he had found the child near an open window after he crawled there. The second report, dated January 23, 1989, indicated that

tusions, abrasions and signs of encopresis infection (the involuntary passage of feces) on his body; X-rays indicated no fractures. The court granted the Department temporary legal and physical custody of Charles and temporary legal custody of Inga, with temporary physical custody remaining with her mother.

The judge found that photographs of Charles "showed extensive bruises." The judge attributed this to "self-abusive behavior" which, the judge found, "steadily subsided" since being placed in foster care. There is no suggestion in the findings that the parents inflicted the bruises on Charles.[7]

On November 6, 1991, approximately one month before the hearing on the petition, the judge granted the Department's motion to remove Inga from her home and to add Alison to the care and protection petition; he committed both girls to the temporary physical custody of the Department. The basis for the Department's decision to seek the removal of the girls, the judge found, was a fourth § 51A report filed November 1, 1991.[8] There Inga, then four and one-half years old, charged that she had been sexually abused by her father. See note 8, *supra*. The judge found that the report was filed by a licensed psychologist who had interviewed Inga after a

---

Charles had bruises on his back and that the examining physician was unconvinced by the mother's account that they had been caused by Charles falling out of his crib.

[7]The Department's March 6, 1991, foster care review report, admitted without objection, notes that after Charles's removal from his home, the Department learned that he had a history of headbanging and throwing himself against the wall, "which appears to be the primary cause[ ] of the bruises seen in 3/90."

[8]The Department did not remove Inga during the roughly eighteen-month period during which it had temporary legal custody of her. The foster care review report dated February, 1991 (nine months prior to the § 51A report), far from describing unresolved problems, stated that Inga's behavior had calmed down considerably since entering a Head Start program, that the mother followed through with ensuring that the children's medical, physical, and safety needs were met, and that there were no documented concerns relative to Alison. It was also noted that, "placement does not apply to Inga (age 4) and Alison (age 9 months). Both children reside at home with their parents who are providing appropriately for them. The parents are following through with all recommended services for them at this time."

member of the staff of the Head Start program, in which Inga was enrolled, expressed concern over "strange statements" Inga had begun to make. The report of the court-appointed investigator, see G. L. c. 119, § 24, submitted on May 22, 1990, was not updated to include any information bearing on Inga's charges.

The judge's findings recite the statements made by Inga and which appear in the § 51A report without any finding as to whether he concluded that the charges were true or false. We summarize the charges in the margin.[9] We need not decide whether this recitation of the incriminating statements made by Inga constitutes conclusory findings that Inga had been sexually abused by her father,[10] see *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 662 (1984) (judge's summaries of what witnesses said treated as facts found), *S.C.*, 395 Mass. 180 (1985), for Inga's statements as they appear in the § 51A report, admitted over the objection of the parents, may not be considered substantively by the judge.

---

[9]Inga told the reporter that her father, whom she calls "Gum" was "getting" her in his bedroom and in the tub, and that he was touching her and making her touch him; he put his penis in her mouth and had "peed white on [her]"; he had been trying to put his "yuccy" into her "yuccy" (a word she used to label both her own and her father's genitals); and her mother sometimes sees what is going on. The § 51A report also contains the statement that Inga "has been observed masturbating and playing with [u]rine."

Inga told the Department interviewer, who investigated the allegations as required by G. L. c. 119, § 51B, that her father attempted to put his "yuccy" into her and that he was "bad" and she did not want him to hurt her anymore.

Although it is far from clear, it would seem, from our reading of an extensive colloquy, that the judge admitted the § 51A report because it was properly authenticated, but that he did not intend, apparently, to admit the report for testimonial purposes. But whether or not he considered the report for the truth of Inga's statements is of no consequence because, for the reasons stated in the text, we give no effect to those statements.

[10]The judge made no express finding as to whether Inga had in fact been abused by her father. Indeed, the judge found that the thorough examination of Inga failed to reveal signs of sexual abuse: her hymen was intact, there were negative cultures for venereal diseases, there was no vaginal discharge, and external genitalia were within normal limits.

Section 51A and § 51B reports, see note 5, *supra*, merely "set the stage," *Custody of Michel*, 28 Mass. App. Ct. 260, 267 (1990). As a required governmental report, a § 51B report may be considered for statements of fact, such as the statement that there was no food in the house, but they may not be considered for diagnosis, prognosis or evaluation. *Ibid.*

If we assume that statements of fact in a § 51A report are also admissible — a conclusion of dubious validity given the fact that the report is not prepared by a public officer in performance of his official duty, see *Julian* v. *Randazzo*, 380 Mass. 391, 393 (1980) — at issue in this case is the separate question of whether accusatory hearsay statements of a child appearing in a § 51A report[11] may be considered substantively in a care and protection proceeding. It is now clear that hearsay statements of a child that are contained in a report of an investigator acting under G. L. c. 119, § 24, are not admissible against the parents unless the parents have a fair opportunity to rebut the statements through cross-examination of the investigator and his sources, and by other means. *Adoption of Carla*, 416 Mass. 510, 514 (1993). See also *Adoption of Sean, ante* 261, 263-264 (1994); *Custody of Michel*, *supra* at 266. That opportunity exists where the child testifies, or where the trial judge has other means to assess the credibility and accuracy of the child's statements. *Adoption of Carla*, *supra* at 514. No such opportunity was provided the parents in this case, for neither the child nor the author of the § 51A report testified. Given the preliminary nature of a § 51A report, see note 5, *supra*, there is no sound reason to be more indulgent about giving substantive effect to the content of a § 51A report than we are regarding the content of the report of an investigator acting under § 24.

---

[11]Inga's charges were reiterated in substance during the course of the Department's investigation of the § 51A report, and they appear again in the § 51B report of the Department. Although the judge admitted in evidence both the § 51A report and the § 51B report, his findings of fact make reference only to the § 51A report. There is no finding with regard to the content of the § 51B report, nor did the judge, in his findings, recite the content of the § 51B report, as he did in the case of the § 51A report. The judge appears not to have relied upon or considered the § 51B report.

The result is that we must review the record before us without the benefit of the hearsay statements of Inga contained in the § 51A report.[12]

The remainder of the judge's findings runs along these lines: service plans were established for the family, the parents attempted to comply, and, at least in one instance, progress was noted. "However," the judge continued, "the fact remains that the children were still exposed to what could only be described as a disorganized, dysfunctional environment. Worker after worker noted the messy, unkempt nature of the home . . . [mother and Inga typically spent] all day watching television . . . [There were] meals of canned ravioli and the like. The clear impression was that of a household unable to comprehend the reason for the service plans. A household, whose intentions may be the best, but whose parenting skills are limited [sic]. It is clear that [the mother] cares about her children and wants them home with her."

As for Alison, none of the judge's forty-nine findings of fact included any charges of abuse by her father, and none specifically referred to the treatment or caretaking she received. "[T]he State interest in protecting neglected children may properly be preventive as well as remedial," *Custody of a Minor (No. 1)*, 377 Mass. 876, 882 (1979), but the fear must be well-founded, see *Custody of a Minor (No.2)*, 378 Mass. 712, 720 (1979). The Department's 1991 foster care review stated, "[t]here have been no documented concerns relative to Alison," and the family's social worker testified that a Department investigator had determined that allegations of possible sexual abuse against Alison were unsubstantiated.

We are left, then, with no findings of sexual abuse of either of the girls, and no physical abuse of Charles. What remains is exceedingly slim. The home was messy and unkempt. Cleanliness of a home is an appropriate factor for

---

[12]Compare G. L. c. 233, § 83, which, in care and protection proceedings, permits the admission of the statements of children regarding sex abuse if the judge makes certain required findings. The findings were not made in this case.

consideration, see *Care and Protection of Three Minors*, 392 Mass. 704, 713 (1984). However, the judge's finding that its condition amounted to a "disorganized [and] dysfunctional" environment deserves little weight in light of the fact that the Department did not seek to remove either of the girls until sexual abuse of Inga was alleged,[13] although the managing social worker had visited the home on approximately thirty occasions and had observed that some areas were very dirty and cluttered.[14] Indeed, she testified that the Department's main concern was that the parents follow through on their children's medical care.

From the fact that Alison ate canned spaghetti three to four times a week for lunch or dinner (a favorite food), and Inga watched television or videos with her mother for five to six hours a day,[15] the judge stated his "clear impression" that the household was unable to comprehend the reason for the Department's service plans. This conclusion is too close to being merely the judge's disapproval of the parents' mode of family life. See *Custody of a Minor*, 389 Mass. 755, 767-768 (1983) (mother's unconventional "life-style" not sufficient to deprive parents of custody of their children). Parents have a presumptive right to raise their children as they see fit, and the judge made no findings that would indicate that the children suffered from "significant physical, mental, or emotional deficits" as in *Custody of a Minor*, *supra* at 768 (1983).

The judge also contrasted Charles's condition before and after his removal from the parental home. See *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 395 Mass. 180, 187 (1985). He found that when first removed, Charles threw "non-stop" temper tantrums, was terrified of getting into the bathwater, and experienced nightmares, but that his

---

[13]Before Alison was born, the Department's Family Life Center provided the parents with a very specific list of what was necessary to clean the home and saw some positive results.

[14]She testified, however, that the children's playroom was "very clean."

[15]The mother testified that she also works on puzzles, and draws and colors with Inga.

condition had improved since being placed in foster care and receiving intensive services. Specifically, his self-abusive behavior had steadily subsided. In contrast, his parents had neglected to seek services for him even though his mother knew she could not manage his behavior.

It is true that the Department offered the basic early intervention services for Charles in 1988 and that the mother refused them.[16] Yet, the severity of Charles's problems was not detected until a postplacement neurological examination was conducted, which revealed the necessity of intensive special services (physical, occupational, and speech therapy), which then were implemented. We also note that the Department's own foster care review, dated February 28, 1991, stated that "sufficient progress has been made over the past six months to warrant maintaining the goal of return home for [Charles]," and that "the family continuity program has begun to work with the family on very specific areas related to parenting and providing a safe home for the children."

In sum, the judge's findings, shorn of Inga's charges, do not, in the aggregate, provide clear and convincing evidence that the three children are in need of care and protection, or that both parents "are presently unfit, unable, unwilling and incompetent to assume responsibility for the care and custody of the children." Compare *Custody of Eleanor*, 414 Mass. 795, 800-801 (1993) (where finding of parental fitness depends "to a large extent" on the charge of sexual abuse, and that charge is not supported by any corroboration or physical evidence, parental unfitness not proven by clear and convincing evidence).

We cannot, however, end our inquiry here. Serious allegations of parental sex abuse are in this record, and the judge, with the assistance of counsel, must determine the truth of those allegations upon remand. Without a judicial appraisal

---

[16]The mother's acceptance of services has not been consistent. Prior to Charles's removal, she rejected a parent aide referral because she did not want strangers in the house. After his placement, a Visiting Nurses Association went into the home from July through December, 1990, discontinuing service when the mother refused to cooperate. After Alison was born, a parent aide went into the home, and Inga was enrolled in Head Start.

of the allegations, there is an unacceptable risk that there will be a miscarriage of justice for the children.

The case must be remanded for further hearings and findings. The report of the investigator appointed under G. L. c. 119, § 24, which, as we noted earlier, was seriously out of date at the commencement of the hearings — it is dated May 22, 1990 — cannot be relied on now, four years later. The investigator must prepare a fresh report for the judge, and she or he must investigate and evaluate the charges made by Inga. The availability and competence of Inga to testify must also be considered and decided. And, if found competent, she should be required to testify in the court proceedings and be available for cross-examination by the parents. Counsel and the judge may also consider the availability of G. L. c. 233, § 83, which permits the admission of hearsay statements of a child under the age of ten upon the conditions and findings described in the statute. With such up-to-date additional evidence, the judge should be in a position to make all necessary findings and conclusions. Meantime, the status quo shall be maintained by the parents and the department.

The judgment is vacated and the case is remanded to the Juvenile Court Department, Worcester Division, for additional hearings on the merits. If any party appeals the clarified final judgment, our court should look favorably on a motion for an expedited appeal.

*So ordered.*