NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-79                                            Appeals Court

ADOPTION OF GARRET (and two companion cases[1]).

No.  17-P-79.

Hampden.      October 4, 2017. - January 22, 2018.

Present:  Agnes, Sacks, & Lemire, JJ.


Adoption, Care and protection, Dispensing with parent's consent,
     Visitation rights.  Parent and Child, Adoption, Care and
     protection of minor, Dispensing with parent's consent to
     adoption, Custody.  Minor, Care and protection, Custody,
     Visitation rights.



     Petitions filed in the Hampden County Division of the
Juvenile Court Department on August 2, 2012.

     The cases were heard by Lois M. Eaton, J.


     Katrina McCusker Rusteika for the mother.
     Madeline Weaver Blanchette for Garret & another.
     Briana Rose Cummings for Susan.
     Jeremy Bayless for Department of Children and Families.
     William B. Tobey, for the father, was present but did not
argue.

---

[1] Adoption of Michael and Adoption of Susan.  The children's
names, and all other names used in this opinion, are pseudonyms.

AGNES, J.  This termination of parental rights case involves a blended family consisting of seven individuals:  the mother, the father, and their child, Susan; Garret and Elizabeth, the father's children from a prior relationship; and Peter and Michael, the mother's children from her prior marriage.  On August 2, 2012, the Department of Children and Families (DCF) filed two petitions pursuant to G. L. c. 119, § 24, in the Juvenile Court alleging that all five children were in need of care and protection.  A judge granted DCF temporary custody of Elizabeth that same day.  DCF was subsequently granted temporary custody of the remaining four children on August 21, 2012.  Both the mother and the father waived their rights to a temporary custody hearing on September 10, 2012. The care and protection petitions were later consolidated.

The termination trial occurred over the course of eleven days in 2014; twenty-three witnesses testified and over fifty exhibits were introduced in evidence.  The judge subsequently made 913 written findings of fact and seventy-one conclusions of law, including conclusions regarding the fourteen factors enumerated in G. L. c. 210, § 3(c), with respect to each parent.[2] As relevant to this appeal, the judge found that the mother and

_____

[2] These included findings and conclusions as to the biological mother of Garret and Elizabeth, whom we shall refer to as Harriet, and the biological father of Peter and Michael, whom we shall refer to as Kevin.  Harriet and Kevin are not parties to this appeal.

the father were unfit to parent Susan and their other respective children both at the time of trial and into the future.[3] All of the children were adjudicated in need of care and protection and were committed to the care of DCF pursuant to G. L. c. 119, § 26. Pursuant to G. L. c. 210, § 3, the judge terminated the mother's parental rights to Susan and Michael,[4] and the father's parental rights to Susan, Garret, and Elizabeth.[5,6] The judge found that it was in Garret's best interests to be placed in the custody of his maternal grandmother. After concluding that the mother (i.e., Garret's stepmother) was not Garret's de facto parent, the judge further determined that visitation between

---

[3] Despite the moral overtones of the statutory term "unfit," the judge's decision was not a moral judgment or a determination that the parents do not love the children in question. The inquiry instead is whether the parents' deficiencies or limitations "place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child." Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017), quoting from Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

[4] Although the mother was found unfit with regard to Peter, her parental rights to him were not terminated. The mother does not appeal this aspect of the judge's decision. Peter's motion to dismiss his appeal as moot based on his attaining the age of majority has been allowed.

[5] The father does not contest the termination of his parental rights on appeal.

[6] Harriet's parental rights to Garret and Elizabeth were also terminated. Kevin was found currently unfit to parent Peter and Michael, but his parental rights were not terminated. As previously noted, Harriet and Kevin are not parties to this appeal.

Garret and the mother should be left to the discretion of DCF, or any adoptive parent or guardian, "consistent with the best interests of the child."  The judge declined to order visitation between Garret and the father on the basis that they did not have a significant relationship or bond.  No order was issued for posttermination sibling visitation.

The mother, the father, Garret, Michael, and Susan raise a variety of issues on appeal, which we address in detail below. For the reasons that follow, we conclude that the judge's findings were supported by the evidence before her, that she properly applied the law to the facts found, and that she did not abuse her discretion with regard to fitness, termination, custody, and visitation.  We therefore affirm the decrees.

Background.  We summarize the relevant facts as found by the judge, reserving some facts for later discussion.[7]

1.  Familial relationship of the parties.  a.  Family one. While living in New York, the father and Harriet entered into a relationship at some point in 1999.  The father was eighteen

_____

[7] The mother does not challenge any of the judge's 913 subsidiary factual findings, apart from the judge's finding, discussed infra, that Garret spent only "a few months in mother's care."  While Garret and Michael state in their brief that the judge relied on clearly erroneous findings, they do not state which specific factual findings were erroneous.  Instead, they argue that the judge relied on some evidence while ignoring other contrary evidence.  The father also states that some of the judge's findings "have no record support at all," but fails to specify which findings are unsupported.  We do not detect any such findings among the ones upon which we rely.

years old at the time, and Harriet was thirteen years old. Harriet became pregnant shortly after the relationship began, giving birth to Garret in the summer of 2000. Harriet later gave birth to the couple's second child, Elizabeth, in September, 2001.

During the course of their relationship, the father committed multiple acts of violence against Harriet. The father did not live with Harriet and the children, did not support them financially, and only visited the children when Harriet requested that he do so. The relationship between the father and Harriet ended in 2003. Garret and Elizabeth continued to live with Harriet until 2010, when New York's Administration for Children's Services removed the children from Harriet's custody, citing her daily marijuana use, lack of suitable housing, and a history of domestic violence between Harriet and her partners.

b. Family two. While living in New York, the mother and Kevin began a relationship in 1996. Their first child, Peter, was born in the winter of 1998. The mother and Kevin married in 1999, when the mother was sixteen years old. The couple had another child, Michael, in the winter of 2003.

The couple's relationship was marred by Kevin's physical abuse of the mother, which occasionally took place in front of Peter and Michael. At some point in 2004 or 2005, Kevin moved to Florida, where he currently resides. The mother petitioned

for custody of Peter and Michael in April, 2007, and the petition was allowed on May 17, 2007. The mother and Kevin divorced in 2010. Kevin did not see Peter or Michael again until they were placed in DCF custody,[8] although he did attempt to contact them after he separated from the mother.

c. <u>Blended family</u>. The mother and the father entered into a relationship in the summer of 2004, when the mother was twenty-one years old and the father was twenty-three years old. That same year, the mother and the father moved in together, along with the mother's children, Peter and Michael. The mother's and the father's child, Susan, was born in April, 2009. However, Garret and Elizabeth, the father's older children, were living with their mother, Harriet, and their maternal grandmother, until the father received custody of both children in the summer of 2010.

The mother and the father married on February 14, 2011. On February 16, 2011, the mother and the father, along with the five children, moved to Massachusetts. The trial judge found that this move was motivated in part by the father's desire to remove Garret and Elizabeth from the presence of their mother, Harriet, and their maternal grandmother, and in part by the

---

[8] Kevin was able to attend one in-person visit with Peter and Michael since their placement in DCF custody. Kevin also spoke with Peter over the telephone once per week in the time leading up to trial.

mother's desire to hide from Kevin. With the exception of Garret, who was sent to live in New York with his paternal grandmother from October, 2011, to July, 2012, the blended family lived together in a three-bedroom apartment until August, 2012, when the children were placed in DCF custody.

Although the mother filed for divorce from the father prior to the trial in this matter, the judge found that the relationship between the mother and the father continued unabated throughout the course of trial. A judgment of divorce nisi between the mother and father entered in the Probate and Family Court in August, 2017.

2. Abuse of Elizabeth. a. Factual circumstances. On August 1, 2012, Elizabeth, who was then eleven years old, ran away from home. She was ultimately transported to a local hospital after she was found with several injuries. Upon her arrival at the hospital, a report pursuant to G. L. c. 119, § 51A (51A report), alleging neglect of all five children and abuse of Elizabeth, was screened in for investigation.[9] A DCF investigator met with Elizabeth at the hospital and observed numerous injuries on her body. When questioned about the source

---

[9] The 51A report was supported after an investigation conducted pursuant to G. L. c. 119, § 51B. The record includes the 51A report, which was received in evidence without objection for a limited purpose and played no role in the judge's determinations. Both the 51A report and the 51B investigative report were redacted prior to their introduction at trial.

of her injuries, Elizabeth indicated that they were inflicted by the father.

At the hospital, Elizabeth was examined by a physician, who was qualified at trial as an expert in pediatrics and child abuse medical assessments. The physician's examination revealed that Elizabeth had a number of traumatic injuries at various stages of healing, including a broken arm. The physician determined that these injuries likely resulted from abuse. As a result, Elizabeth was placed in a foster home on August 2, 2012. Garret, Peter, Michael, and Susan were removed from the mother's and the father's care on August 21, 2012, after the mother and the father were arrested and charged with crimes arising from the abuse of Elizabeth.

On April 27, 2015, the father pleaded guilty to charges arising from his abuse of Elizabeth.[10] The father was sentenced to from five to seven years in State prison, followed by a probationary term of six years to be served from and after his incarceration. On that same date, the mother pleaded guilty to

---

[10] The father pleaded guilty to abuse of a child under sixteen with bodily injury, two counts of assault and battery by means of a dangerous weapon, and assault and battery. The Commonwealth nol prossed two counts of rape of a child and two additional counts of assault and battery by means of a dangerous weapon.

assault and battery and wantonly permitting the endangerment of a child.[11]  The mother was sentenced to five years of probation.

At trial, Elizabeth testified at length about the physical and verbal abuse that she was subjected to by both the mother and the father.[12]  Other evidence, including the testimony of the physician who treated Elizabeth upon her arrival at the hospital, two court investigator reports, and the testimony of Elizabeth's foster mother, provided the judge with a detailed account of Elizabeth's extensive injuries.  While abundant evidence regarding the abuse of Elizabeth was presented at trial, the evidence was in conflict as to whether any of the four other children living with the mother and the father were physically abused.[13]

b.  <u>The mother's testimony at trial</u>.  At trial, the mother consistently denied that she had knowledge of or participated in the abuse of Elizabeth.  The mother denied ever seeing the

---

[11] With regard to the mother, the Commonwealth nol prossed three counts of abuse of a child under sixteen with bodily injury, and assault and battery by means of a dangerous weapon.

[12] The mother denied physically abusing Elizabeth, but this testimony was not credited by the judge.

[13] Michael denied being hit by the mother or the father, and Garret gave conflicting testimony as to whether he was physically disciplined by either the mother or the father. Elizabeth testified that the mother and the father also hit Garret.  The children were seen by doctors after being placed in foster care, none of whom reported any concern that the children (other than Elizabeth) had been physically abused.

father hit Elizabeth and stated that she was unaware of the extensive injuries sustained by Elizabeth beyond two "cat scratches." When questioned about photographs of Elizabeth's injuries that she was shown prior to trial, the mother stated that she believed that Elizabeth was abused, but denied any knowledge of the abuse and indicated that she never saw the father being abusive toward Elizabeth. The judge did not credit any of this testimony. Instead, she concluded that the "[mother] was a participant in [Elizabeth's] abuse, and that she conspired with [the father] to intentionally deny [Elizabeth] medical treatment."

The mother also testified that her relationship with the father ended after she saw photographs of Elizabeth's wounds and heard the allegations of the father's sexual abuse of Elizabeth. The judge did not credit these assertions by the mother. Instead, the judge concluded that the mother and the father remained in a committed relationship throughout the duration of the trial.[14]

---

[14] Pursuant to Mass.R.A.P. 16(l), as amended, 386 Mass. 1247 (1982), the mother submitted portions of a Probate and Family Court docket indicating that a judgment of divorce nisi between the mother and father entered in August, 2017. We may take judicial notice of the records of other courts in related actions. See Jarosz v. Palmer, 436 Mass. 526, 530 (2002). However, the fact that a judgment of divorce nisi entered does not undermine the judge's conclusion that the mother and the father remained in a committed relationship during trial and

3.  DCF service plans.  A total of seven DCF service plans were formulated and approved prior to trial.  DCF's initial goal was to reunify the family.  However, in April, 2013, after an investigation conducted pursuant to G. L. c. 119, § 51B, supported an allegation that Elizabeth was sexually abused by the father, DCF's goal for all of the children was changed to adoption.

The mother's service plan tasks were regularly updated throughout the pendency of the case.  Her tasks included requirements that she attend parenting classes and engage in anger management services and individual therapy.  The service plans also set boundaries related to the mother's supervised visits with the children.  In November, 2013, the mother was given new tasks to complete under a revised service plan.  The revised plan assigned the mother twenty-two tasks to complete, and included new tasks requiring the mother to (1) "[g]ain insight regarding how the choice to remain in a relationship with [the father] affects her ability to parent"; (2) "acknowledge responsibility for not protecting [Elizabeth] from abuse by [the father]"; and (3) "acknowledge responsibility for

_____

does not conclusively demonstrate that the relationship has ended.

abusing [Elizabeth]."[15]  The judge found that the mother complied with the majority of the tasks laid out in the service plans, but that she failed to complete the new tasks assigned to her in the November, 2013, plan.  More specifically, the judge found that the mother did not gain any insight into how her choice to remain with the father affected her ability to parent and that she failed to acknowledge her own responsibility for Elizabeth's abuse.  The mother's failure to complete those enumerated tasks led the judge to conclude that the mother did not benefit from the services provided to her under her service plans.

Discussion.  1.  Termination of the mother's parental rights.  Before a parent's rights may be terminated, the trial judge must engage in a two-step analysis.  Adoption of Nancy, 443 Mass. 512, 515 (2005).  First, the judge must determine whether the parent is fit to carry out the duties and responsibilities required of a parent.  Adoption of Gillian, 63 Mass. App. Ct. 398, 403-404 (2005).  If the parent is deemed unfit, the judge must then determine whether termination of parental rights is in the child's best interests.  Ibid.  "[T]he 'parental fitness' test and the 'best interests of the child test' are not mutually exclusive, but rather 'reflect different

---

[15] Although the mother signed this service plan, she listed a number of reservations that she had with its terms, which included a statement that she "can't acknowledge having physically abused the children because she didn't abuse them."

degrees of emphasis on the same factors.'" Care & Protection of Three Minors, 392 Mass. 704, 714 (1984), quoting from Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975).

   a.  The mother's fitness.  While their underlying arguments vary, the mother, the father, and Michael challenge the judge's ultimate conclusion that the mother was unfit to parent Michael and Susan as erroneous.[16]  We disagree.

   In determining whether parental rights should be terminated, parental fitness is the "critical inquiry," and a determination that a parent is unfit must be proved by clear and convincing evidence.  Adoption of Gillian, 63 Mass. App. Ct. at 404, quoting from Adoption of Frederick, 405 Mass. 1, 4 (1989). In making this determination, a judge must consider "a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. 705, 711 (1993).  "[O]ur role on review of a trial judge's findings is extremely limited; we do not 'assess the evidence de novo, but rather . . . determine whether the judge's findings were clearly erroneous and whether they proved parental unfitness by clear and convincing evidence.'"  Adoption of Roni, 56 Mass. App. Ct.

_____

   [16] Susan herself does not challenge the determination of the mother's unfitness.

52, 58 (2002), quoting from Custody of Eleanor, 414 Mass. 795,
802 (1993).

In Custody of Vaughn, 422 Mass. 590, 595 (1996), the
Supreme Judicial Court observed that "physical force within the
family is both intolerable and too readily tolerated, and . . .
a child who has been either the victim or the spectator of such
abuse suffers a distinctly grievous kind of harm."  In this
case, there was considerable evidence that the other children
living in the household with the mother and the father knew of,
and were affected by, the abuse of Elizabeth.[17]  The judge found

---

[17] The father challenges the judge's use of this evidence in
finding the mother unfit, arguing that much of the evidence
consisted of hearsay statements made by the children set forth
in the court investigator's report and that he did not have an
adequate opportunity to question the children about these
statements.  However, it is settled that the report of a court
investigator is admissible and becomes part of the record in a
care and protection proceeding.  See, e.g., Care & Protection of
Zita, 455 Mass. 272, 281 (2009).  See also Mass. G. Evid.
§ 1115(c)(1) (2017).  Any hearsay statements contained in the
report, including multilevel hearsay, are admissible if the
declarant is identifiable and the parties have a fair
opportunity to rebut the statements of both the investigator and
her sources "through cross-examination and other means."
Custody of Michel, 28 Mass. App. Ct. 260, 266 (1990).  Such
opportunity exists as to the hearsay statements of children
"where the child testifies, or where the trial judge has other
means to assess the credibility and accuracy of the child's
statements."  Care & Protection of Inga, 36 Mass. App. Ct. 660,
664 (1994).  See Adoption of Carla, 416 Mass. 510, 514 (1993).
Here, Garret, Elizabeth, and Michael testified at trial, and all
parties were provided with the opportunity to submit questions
to them, which were read to the children by the judge.  The
court investigator was also listed as a potential witness, and
the opportunity to present her as a witness and question her was
afforded to the parties.  See Care & Protection of Leo, 38 Mass.

15

that the other children described Elizabeth as "bad" and
confirmed that she was "hit with a belt because she is bad."
The judge further found that Michael knew of Elizabeth's abuse
based on his immediate denial, during his interview with a DCF
investigator, that anyone in the household was abused.
Moreover, Garret told the court-appointed investigator that
Elizabeth constantly did bad things, and he believed that the
investigator also would have beaten Elizabeth if the
investigator had been in the position of caring for her.  The
judge credited the statements of Garret and Michael and relied
on those statements as evidence that the other children in the
household were aware of the abuse suffered by Elizabeth.
Contrast Care & Protection of Lillith, 61 Mass. App. Ct. 132,
142 (2004) (remanding case for clarification of judge's findings
of domestic violence occurring in front of child, where judge
failed to assess credibility of witnesses' conflicting
testimony).  The judge thus was warranted in finding that the
other children in the home were exposed to the abuse of
Elizabeth while they were in the care of the mother, and they
thereby "suffer[ed] a distinctly grievous kind of harm."
Custody of Vaughn, 422 Mass. at 595.  See G. L. c. 210,
§ 3(c)(ix) ("severe or repetitive conduct of a physically,

App. Ct. 237, 243 (1995).  The judge thus did not err in relying
on the court investigator's report in support of her findings as
to the mother's unfitness.

emotionally or sexually abusive or neglectful nature toward the child or <u>toward another child in the home</u>" to be considered in determining parental fitness [emphasis added]).

Although the brunt of the abuse endured by Elizabeth was at the hands of the father, the mother's role in the abuse was significant. The testimony of Elizabeth and her foster mother, which need not be recounted here, depicted the severity of the physical abuse inflicted directly by mother. See G. L. c. 210, § 3(c)(ix). The mother pleaded guilty to criminal charges brought against her for her role in the abuse of Elizabeth and received a lengthy probationary sentence. In addition to abusing Elizabeth directly, the mother also failed to protect Elizabeth from the even more severe abuse perpetrated by the father. The judge concluded that the mother "conspired with [the father] to intentionally deny [Elizabeth] medical treatment" for injuries inflicted by the father. See <u>Adoption of Larry</u>, 434 Mass. 456, 472 (2001) (failure of mother to protect child from father's physical abuse probative of mother's parental unfitness).

The judge also made extensive findings that the mother remained in a committed relationship with the father, despite his serving from five to seven years in State prison after pleading guilty to charges stemming from his abuse of

Elizabeth.[18]  The judge further found that the mother failed to benefit from the services set forth in her DCF service plan and concluded that the mother's parenting deficiencies were not resolved, based on her "refusal to acknowledge her role in [Elizabeth]'s abuse, her alliance with [Elizabeth]'s abuser, and her deceitful actions to hide the abuse," which "continued unabated despite the services offered."  Despite the mother's compliance with the majority of the tasks assigned to her under her DCF service plan, the judge was warranted in concluding that the mother's failure to benefit from those services rendered her unfit to carry out her parental duties with respect to Michael and Susan.[19]  See G. L. c. 210, § 3(c)(ii); Adoption of Lorna, 46

---

[18] While the mother argues that the judge failed to consider evidence demonstrating the mother's intent to separate from the father, it is apparent from the judge's findings that she did consider this evidence and determined that it was not credible. See Adoption of Hugo, 428 Mass. 219, 229 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999) ("As the trier of fact, [the judge] was in the best position to evaluate all the evidence, contradictory at times"); Adoption of Larry, 434 Mass. at 467-468.

[19] The father argues that DCF failed to make reasonable efforts to reunify the children with the mother because it did not give mother more tasks to complete under her service plan. Assuming that the father has standing to make such an argument, it was not raised in a timely manner and is therefore waived. See Adoption of Gregory, 434 Mass. 117, 124 (2001); Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), S.C., 460 Mass. 72 (2011).  In any event, the argument is without merit, as "[a] determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest."  G. L. c. 119, § 29C. We also note that the recent decision in Care & Protection of

Mass. App. Ct. 134, 143 (1999) (judge's determination that parents failed to benefit from service plans not clearly erroneous despite parents' substantial compliance with plan requirements).  The judge was entitled to conclude that the mother's past actions, her failure to benefit from her service plan, and her continued commitment to the father indicated that she would be unable to protect her children from any future abuse by the father, should such abuse occur.  See Adoption of Carlos, 413 Mass. 339, 349-350 (1992) (inquiry into future parental fitness is appropriate when determining whether to terminate parental rights).

Although little evidence was presented at trial as to the physical abuse of any child in the home apart from Elizabeth, we agree with the judge's conclusion that the exposure of the other children in the care of the mother to the abuse of Elizabeth, in addition to the mother's role in the physical abuse of Elizabeth, her refusal to acknowledge and take responsibility

---

Walt, 478 Mass. 212 (2017), concerning "reasonable efforts" when transferring custody to DCF at an emergency hearing and at a seventy-two hour hearing, does not undermine our decision in this case because the seventy-two hour hearing in the case before us was waived by both the mother and the father, and the removal of the children from their home was due to the severe, repetitive abuse of Elizabeth by the mother and the father.  See G. L. c. 119, § 29C (reasonable efforts not required prior to removal of children from home where a parent has subjected "the child or other children in the home to . . . severe or repetitive conduct of a physically or emotionally abusive nature").

for such abuse, and her continued commitment to the father, rendered the mother unfit to parent the children who were not directly subjected to physical abuse.

b. Best interests of the children. The mother maintains that the judge erred in finding that the termination of the mother's parental rights was in the best interests of Michael and Susan. Michael also argues that termination of the mother's rights was not in his best interests. The mother further argues that the judge abused her discretion by failing to articulate her reasoning as to why the mother's parental rights were terminated with respect to Michael but not Peter. The mother also asserts that it was an abuse of discretion for the judge to find that it was in Michael's best interests to terminate the mother's parental rights, where the judge did not terminate the parental rights of Kevin, Michael's biological father.

Once a parent is deemed unfit, the judge must then determine whether it is in the best interests of the child to end all legal relations between the child and the parent, taking into consideration "the ability, capacity, fitness and readiness of the child's parents" as well as "the plan propose by [DCF]." Adoption of Nancy, 443 Mass. at 515-516, quoting from G. L. c. 210, § 3(c). The "best interests of the child" standard requires the trial judge to make a discretionary decision based on her experience and judgment, and will not be overturned

unless it amounts to an abuse of discretion or a clear error of law. Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

After reviewing the judge's extensive factual findings and conclusions of law, it is apparent that the judge carefully considered the evidence before her, including evidence that Michael wished to live with the mother, the father (his stepfather), and the other children, in reaching her best interests determinations with respect to Michael and Susan. The judge did not abuse her discretion in concluding that the termination of the mother's parental rights was in the best interests of both children. See Adoption of Nancy, 443 Mass. at 516. See also L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). As to the mother's contention that the judge abused her discretion in terminating the mother's parental rights to Michael where the judge did not terminate the mother's parental rights to Peter, the judge specifically noted that Peter was approaching his seventeenth birthday, whereas Michael was eleven years old at the time of trial. The decision was not an abuse of discretion, but rather an indication of the judge's close consideration of the record before her.[20] The same is true with

---

[20] The mother argues that the judge's failure to make a distinction in her reasoning as to why termination of her parental rights was in Michael's interest and not Peter's "casts doubt on the justification for terminating [the m]other's rights

respect to the judge's decision not to terminate Kevin's parental rights to Peter and Michael, given the differences in the mother's and Kevin's respective circumstances that were carefully detailed in the judge's factual findings.

Based on the foregoing, we conclude that the judge's decisions with respect to the best interests of Michael and Susan were not an abuse of discretion.

2. <u>Custody of Garret</u>. Garret's biological parents, the father and Harriet, were both found unfit to care for Garret and their parental rights were terminated. The termination of their parental rights is not disputed on appeal. However, the mother (Garret's stepmother) argues that she should have been granted custody of Garret, and that the judge thus erred in granting custody of him to his maternal grandmother. The mother relies on her arguments in support of her fitness to parent Michael and Susan, as well as the close bond between herself and Garret, in support of this contention.

In making a custody determination, the "driving factor" is the best interests of the child. <u>Adoption of Irene</u>, 54 Mass.

---

to [Michael]." However, "[w]hile not specifically stating the reasons that termination was in the [child's] best interest, the judge's factual findings were specific and detailed, demonstrating that close attention was paid to the evidence and the fourteen factors listed in G. L. c. 210, § 3(c). Although it would be better practice specifically to state the reasons that termination is in the child's best interest, such specificity is not required." <u>Adoption of Nancy</u>, 443 Mass. at 516.

App. Ct. 613, 617 (2002). The wishes of the child at the center of the custody determination must be considered, but are not dispositive. Adoption of Nancy, 443 Mass. at 518. A judge's determination as to what is in the best interests of the child will not be overturned on appeal unless it amounts to an abuse of discretion or a clear error of law. Adoption of Hugo, 428 Mass. at 225.

As discussed supra, it is apparent that the judge considered all of the evidence before reaching each of her conclusions in this case, including her decision as to what custody arrangement was in Garret's best interests. The judge noted Garret's wish to remain in the custody of the mother, but ultimately decided that placing him in the custody of his maternal grandmother, with whom he had previously lived for an extended period of time, was in his best interests. The record makes clear that Garret's wishes were properly considered in determining which placement would best serve his interests, and the judge was not required to make a custody determination in accordance with his views on the matter. See Adoption of Nancy, 443 Mass. at 518. The judge did not abuse her discretion in approving DCF's plan to place Garret in the custody of his maternal grandmother; the judge considered the relevant factors

and her decision did not "fall[] outside the range of reasonable alternatives."[21]  L.L. v. Commonwealth, 470 Mass. at 185 n.27.

3.  Visitation.  a.  Visitation with the mother.  Garret and the mother contend that the mother should have been deemed Garret's de facto parent and, as such, visitation between the two should have been ordered by the judge.

"A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family.  The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of the caretaking functions at least as great as the legal parent."  E.N.O. v. L.M.M., 429 Mass. 824, 829, cert. denied, 528 U.S. 1005 (1999).  A finding that a person is a de facto parent permits a judge to order visitation between a child and the de facto parent in the absence of a statute explicitly authorizing such visitation.  See id. at 827-832.  In such a case, a judge may, through an exercise of her equitable powers, order visitation between a child and the de

_____

[21] The father claims error on the basis that the judge failed to consider his plan for placement of his children. While the judge made no explicit finding as to the father's plan, his proposed plan placed his children in the care of the mother.  The reasoning underlying the judge's adjudication of the mother as unfit to care for her own children makes clear that the mother was equally ill-suited to care for Garret.  It should also be noted that a condition of the mother's probation required that she not have unsupervised contact with children under the age of sixteen, except for her three biological children, Peter, Michael, and Susan.

facto parent, provided that such an order is in the best interests of the child.  See ibid.  See also Care & Protection of Sharlene, 445 Mass. 756, 767 (2006).

For a caretaker to be recognized as a de facto parent, there must be "a significant preexisting relationship that would allow an inference, when evaluating a child's best interests, that measurable harm would befall the child on the disruption of that relationship."  Care & Protection of Sharlene, supra. Inherent in this determination is the idea that the bond between the prospective de facto parent and the child is "above all, loving and nurturing."  Ibid.  In reviewing a trial judge's de facto parent determination, "[a]bsent clear error, we will not substitute our weighing of the evidence for that of a trial judge who had the opportunity to observe the witnesses and form conclusions about their credibility, even if our weighing of the evidence might have differed from that of the judge."  A.H. v. M.P., 447 Mass. 828, 838 (2006).

The judge concluded that the mother was not Garret's de facto parent on the basis that Garret spent most of his time living with his maternal grandmother after the mother and the father married, and that he was only in the care of the mother for "a few months."  Our review of the record leads us to conclude that the finding that Garret was in the care of the mother for "a few months" was erroneous, as the evidence shows

that he lived with the mother for approximately fifteen months. Additionally, we conclude that the judge erred in relying solely on the length of time that Garret was in the mother's care in concluding that the mother had not established her status as his de facto parent. These errors, however, do not affect the judge's ultimate conclusion that the mother was not Garret's de facto parent.

In Blixt v. Blixt, 437 Mass. 649, 659 n.15 (2002), the Supreme Judicial Court noted that the definition of "de facto parent" set forth in ALI Principles of the Law of Family Dissolution § 2.03(c) (Tent. Draft No. 4 2000) required that an individual seeking de facto parent status live with the child and perform care taking functions for at least two years. The court again referred to the two-year requirement in the context of de facto parent status in Care & Protection of Sharlene, 445 Mass. at 766-767. In that case, the court deemed the two-year requirement a "further refinement[]" to the concept of de facto parenthood, but expressly noted that such a requirement has not been adopted in Massachusetts. Ibid. Again in A.H. v. M.P., 447 Mass. at 837 n.13, the court discussed the two-year requirement set forth in the ALI Principles, but chose to "express no opinion on the two-year requirement." The court's repeated references to the two-year requirement indicate that the length of time a person seeking de facto parent status has

lived with the child is relevant to the court's determination, but is not the sole factor.

Here, in addition to the fact that Garret and the mother lived together for less than two years,[22] the judge's findings lead us to conclude that the bond between Garret and the mother was far from nurturing. In our discussion of mother's parental fitness, supra, we explained in detail that the children in the household were exposed to the abuse of Elizabeth while in the mother's care. While we do not ignore the close relationship between Garret and the mother,[23] the exposure of Garret to such abuse leads us to conclude that the mother did not provide him with the nurturing bond necessary to establish that she was his de facto parent. See Care & Protection of Sharlene, 445 Mass. at 767-768. As she is not his de facto parent, the mother is not entitled to court-ordered visitation with Garret. See E.N.O. v. L.M.M., 429 Mass. at 827-832. See also Care & Protection of Sharlene, supra at 767.

---

[22] This should not be understood as an expression of the opinion that a caretaker of an infant or child under two years of age cannot be considered a de facto parent.

[23] Garret calls the mother "mommy" or "mom," and wants to be placed in her care. The mother sees Garret as her son and, as discussed above, sought custody of him. The mother also regularly attended supervised visits with him prior to trial.

b. <u>Visitation with the father</u>. Garret argues that the judge abused her discretion in failing to order posttermination visits between Garret and the father.

In terminating parental rights pursuant to G. L. c. 210, § 3, the Juvenile Court judge has the equitable authority to order visitation between a child and a biological parent where such contact is in the best interests of the child. See <u>Adoption of Greta</u>, 431 Mass. 577, 588 (2000); <u>Adoption of Ilona</u>, 459 Mass. 53, 63 (2011). "Whether such contact in any given case is wise is a matter that should be left to the discretion of the judge." <u>Youmans</u> v. <u>Ramos</u>, 429 Mass. 774, 783 (1999). See <u>Adoption of John</u>, 53 Mass. App. Ct. 431, 439 (2001).

Here, the judge found that there was no significant relationship or bond between Garret and the father and concluded that visitation should be left to the discretion of DCF or Garret's adoptive family. The evidence shows that the father was largely absent from Garret's life until receiving custody of Garret in the summer of 2010. After the custody award in New York, Garret only lived with the father for a period of approximately fifteen months, during which time Garret was living in an abusive household. The judge did not err in

concluding that it was not in Garret's best interests to order visitation with the father.[24]

c.  Sibling visitation.  The father, Garret, Michael, and Susan all contend that the judge erred in failing to order sibling visitation for the children.  Garret, Michael, and Susan argue that the language of G. L. c. 119, § 26B(b), requires the judge in this case to make a determination regarding sibling visitation.

Posttermination sibling visitation is governed by G. L. c. 119, § 26B(b), inserted by St. 2008, c. 176, § 84, which states in pertinent part:  "The court or [DCF] shall, whenever reasonable and practical and based upon a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings in other foster or pre-adoptive homes . . . ." (emphasis added).  The plain language of the statute states that posttermination sibling visitation may be managed by either the court or DCF.  Here, evidence was presented that sibling visitation was being

---

[24] We note that DCF was exploring the idea of posttermination contact between the father and Garret at the time of trial.

provided by DCF, and the judge was thus under no obligation to order visitation pursuant to G. L. c. 119, § 26B(b).[25]

Prior to the enactment of G. L. c. 119, § 26B, in 2008, G. L. c. 119, § 26(5), inserted by St. 1997, c. 43, § 99, gave the court exclusive control over sibling visitation orders.  In Adoption of Rico, 72 Mass. App. Ct. 214, 221 (2008), S.C., 453 Mass. 749, 753 n.12 (2009), this court construed the sibling visitation provision set forth in G. L. c. 119, § 26(5), as mandating that the judge decide "whether, and if so, how visitation is to occur."  Because we were interpreting a different statute in that case, which by its plain language provided that the judge alone was required to make sibling visitation determinations, our decision there has no bearing on our interpretation of the language set forth in the current statute, G. L. c. 119, § 26B(b), which gives the judge and DCF concurrent authority to ensure that sibling visitation is carried out.[26]  The same can be said of this court's decision in Adoption of Galvin, 55 Mass. App. Ct. 912, 913-914 (2002).

---

[25] Additionally, the children have a statutory right to petition the Juvenile Court under G. L. c. 119, § 26B(b), if they are dissatisfied with the state of visitation.

[26] Garret's and Michael's assertion that the Supreme Judicial Court's decision on further appellate review, see Adoption of Rico, 453 Mass. 749, is controlling is also misplaced.  The Supreme Judicial Court did not substantively discuss sibling visitation beyond a footnote denoting its approval of the manner in which the Appeals Court had dealt with

Finally, Garret and Michael rely on Care & Protection of Jamison, 467 Mass. 269 (2014), in arguing that the judge below was required to make a sibling visitation order. In that case, the court determined that G. L. c. 119, § 26B(b), gave the Juvenile Court subject matter jurisdiction to adjudicate a petition for visitation between a child in DCF custody and his siblings, who were subject to guardianship. Id. at 280. In its analysis, the court stated: "Paragraph one [of G. L. c. 119, § 26B(b),] states that the Juvenile Court 'shall, whenever reasonable and practical and based on a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings in other foster or pre-adoptive homes . . . .'" Id. at 277. This language omits any reference to the initial portion of G. L. c. 119, § 26B(b), which states: "The court or the department shall, whenever reasonable and practical and based upon a determination of the best interests of the child, ensure that children placed in foster care shall have access to and visitation with siblings in other foster or pre-adoptive homes . . ." (emphasis added). In light of this plain language, Care

_____

the issue. Id. at 753 n.12. The entirety of the Supreme Judicial Court's opinion, rather, focused on the equitable authority of the Juvenile Court to order posttermination visitation between a child and his biological father. As such, it also has no bearing on our adjudication of this case with respect to sibling visitation.

& Protection of Jamison should not be read to foreclose a judge's leaving sibling visitation to DCF, subject to further review by the court.[27]

In sum, we conclude that the Juvenile Court did not err in failing to make sibling visitation orders based on the plain language of G. L. c. 119, § 26B(b), which allows DCF to manage posttermination sibling visitation.

Decrees affirmed.

---

[27] The same can be said of this court's decision in Adoption of Zander, 83 Mass. App. Ct. 363, 367 (2013). In that case, the trial judge chose to leave the timing and frequency of sibling visitation to the discretion of the children's adoptive parents. We held that the trial judge was required to provide a posttermination sibling visitation schedule because G. L. c. 119, § 26B(b), precluded the judge from leaving such visitation to the discretion of adoptive parents. While we did not mention the portion of the statute giving DCF concurrent jurisdiction over sibling visitation, DCF was not involved in the sibling visitation process in that case, and we do not read it as precluding DCF from ensuring that sibling visitation is being carried out.