NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-949

CARE AND PROTECTION OF ANDRE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a Juvenile Court judge found the mother currently unfit to parent the child, adjudicated the child in need of care and protection, and placed the child in the permanent custody of the Department of Children and Families (department).  The mother's parental rights remained intact, and the department's goal remained reunification.  Concluding that the mother's incarceration at the time of trial and her inadequate care plan established her current unfitness by clear and convincing evidence and that it was within the judge's discretion to deny the mother's motion to reopen evidence, we affirm.

Background.  In November 2021, the mother's parental rights to her two older children were terminated.  In June 2023, the

_____

[1] A pseudonym.

child was born.  After the department received a report pursuant to G. L. c. 119, § 51A (51A report), alleging that the child was born substance exposed, the mother told a court investigator that she had a history of drug and alcohol abuse and had largely been sober for the past seventeen months, but had relapsed during March or April of 2023, while she was pregnant with the child.

On February 2, 2021, the mother was charged with assault and battery, wanton destruction of property, and malicious destruction of property (February charges).  The mother was subject to pretrial conditions of release on the February charges.  On March 18, 2021, the mother was charged with assault and battery on a family or household member (March charge).  On May 20, 2021, the mother again was charged with assault and battery on a family or household member.  On June 6, 2021, the mother was charged with receiving stolen property.  The mother was placed on probation for the February and March charges on September 29, 2021.  The mother defaulted on multiple court appearances, culminating in a March 8, 2023 default, for which a probation warrant and default warrants were issued.[2]

On July 3, 2023, the mother reported to a department social worker that she was receiving drug addiction treatment,

---

[2] The May 2021 domestic assault and battery charge had been dismissed on February 28, 2023.

participating in support groups, and had a relapse prevention plan in place.  The mother denied having a criminal background or history of domestic violence.  She also falsely stated that she had an "open" probation matter that "she did not need to check in on" when, in fact, she was in default on her probation case.  On July 6, 2023, the department sought and received temporary custody of the child, because of concerns surrounding the mother's relatively short period of sobriety and ability to parent the child on her own in light of her history of substance abuse, and mental health and domestic violence issues.  On or around July 7, 2023, the department placed the child with the mother at a residential treatment program.  In December 2023, after the mother allegedly failed to comply with the residential treatment program's rules and had interpersonal conflicts with its staff, the mother was discharged from the program.  In January 2024, the mother and the child moved to a second residential treatment program.

Prior to March 15, 2024, a department supervisor advised the mother that it would remove the child from her care if she were discharged from another program.  The mother was discharged from the second residential treatment program.  The mother acknowledged that the discharge resulted from a verbal altercation with another resident.  The judge found that the mother's conduct was the cause of her interpersonal conflicts

3

and discharges from the programs. Following the second discharge, the department removed the child from the mother's care.

On March 21, 2024, the mother called a department supervisor to ask why the department would not return the child to her care, and the supervisor responded that the department needed to determine whether the mother was able to manage her anger and comply with the rules of a residential program. The mother swore at the supervisor, called her names, and said that she was going to kill herself.

On March 25, 2024, the mother addressed the warrants on her criminal cases, which had been outstanding for over a year. In July 2023, the mother had assured the department that she would deal with the warrants within seven days but did not do so. The mother was held in custody, and she remained incarcerated on the date of her trial in the present case. At the time of trial, the mother's period of incarceration was unknown. At trial, the mother offered a potential caretaker for the child, but the potential caretaker did not appear in court or testify. At the conclusion of trial, the judge reviewed the mother's updated court activity record information, and noted that the mother was not only being held on four warrants, but also she was subject to future probation violation proceedings. The judge found the mother currently unfit to assume parental responsibility of the

4

child and ordered that the child remain in the custody of the department. The judge determined that it was in child's best interests to remain in the foster home he shared with his siblings. On June 11, 2024, the judge denied the mother's motion to reopen evidence and committed the child to the permanent custody of the department.

Discussion. 1. The mother's unfitness. The mother contends that the judge erred in finding that she was unfit to parent the child. "[I]n any proceeding to commit a child permanently to the custody of the department, the department bears the burden of proving, by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection" (quotation and citation omitted). Care & Protection of Rashida, 489 Mass. 128, 131 (2022). "In making a custody determination, the driving factor is the best interests of the child" (quotation and citation omitted). Adoption of Garret, 92 Mass. App. Ct. 664, 676 (2018). "The best interests of the child standard requires the trial judge to make a discretionary decision based on her experience and judgment, and [the decision] will not be overturned unless it amounts to an abuse of discretion or a clear error of law" (quotation and citation omitted). Id. at 675. "Parental unfitness must be determined by taking into consideration a parent's character, temperament,

conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993).

Here, the fact that the mother was incarcerated indefinitely at the time of trial, coupled with her inadequate substitute care plan, supported the judge's finding that the mother was currently unfit. See Adoption of Mary, 414 Mass. at 711; Adoption of Serge, 52 Mass. App. Ct. 1, 8 (2001) ("Physical unavailability of the parent to provide day to day care for the child, including for reasons of incarceration, was relevant evidence of unfitness"). Simply put, the mother's incarceration made her unavailable to assume custody of the child, even if she were otherwise fit, and the judge was not presented with any substitute caregiver who was fit and available to take care of the child.[3] Although the mother was hopeful that she would be released shortly after the trial, as the judge found, "there was no guarantees that [the mother's] hopes would be realized." Moreover, the mother's alternative caretaker neither appeared in

_____

[3] Based on this conclusion, we need not and do not address the mother's contentions that the judge erred by (1) considering the mother's probation record because that record did not contain any convictions, and was not relevant to her parenting abilities; (2) relying on 51A reports or the court investigator's report to make findings regarding the mother's history of substance abuse and domestic violence; and (3) using stale evidence of the mother's history of domestic violence and substance abuse.

court physically nor testified virtually. The only evidence of the mother's proposed caretaker's qualifications was the mother's testimony that the proposed caretaker was currently a foster parent, was a "good parent," and had previously taken care of the mother's older children. The judge found that she was unable to even evaluate whether the mother's proposed caregiver was fit and available. Thus, as the judge noted, even if she had ruled in the mother's favor on the day of the trial, as a practical matter, no suitable substitute caregiver was available to provide care to the child.

"At the core of the [parental fitness] inquiry is the question of what is in the best interests of the child." Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997). Here, the judge found that given the mother's unavailability and her inability to assess the mother's substitute caregiver, the child's "welfare and security outweighed Mother's custody rights," and that it was in the child's best interests to remain in the foster home he shared with his siblings. We discern no abuse of discretion or error in the judge's determination that the mother was currently unfit at the time of trial and that placing the child in the department's permanent custody was in the child's best interest. See Adoption of Mary, 414 Mass. at 711.

7

2. The judge's decision not to reopen evidence. The mother also argues that the judge abused her discretion by denying the mother's motion to reopen evidence because the mother was released from custody three days after the end of trial. The decision whether to reopen evidence is within the discretion of the trial judge. See Clark v. Leisure Woods Estates, Inc., 89 Mass. App. Ct. 87, 95 (2016). At the hearing on the mother's motion, the department's attorney told the judge that the mother had been arrested on a new assault and battery charge after she was released from custody. Additionally, the mother's parental rights remained intact, and the department's goal was reunification. The mother was entitled to a review and redetermination hearing in less than four months from the date of the judge's denial of the motion. See G. L. c. 119, § 26 (c). The judge's decision not to reopen evidence was not a "clear error of judgment" falling "outside the range of reasonable alternatives," and thus not an abuse of the judge's discretion. See Adoption of Talik, 92 Mass. App. Ct. 367, 375

(2017), quoting <u>L.L.</u> v. <u>Commonwealth</u>, 470 Mass. 169, 185 n.27 (2014).

<u>Judgment affirmed</u>.

<u>Order denying motion to<br>   reopen evidence affirmed</u>.

By the Court (Blake, C.J.,<br>   Ditkoff & Brennan, JJ.[4]),

Clerk

Entered:   June 23, 2025.

---

[4] The panelists are listed in order of seniority.