NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

20-P-654                                          Appeals Court

ADOPTION OF XARISSA.[1]


No. 20-P-654.

Bristol.     March 3, 2021. – May 24, 2021.

Present:  Massing, Henry, & Ditkoff, JJ.


Adoption, Dispensing with parent's consent, Visitation rights,
     Care and protection.  Parent and Child, Adoption, Custody,
     Custody of minor, Dispensing with parent's consent to
     adoption, Care and protection of minor.  Minor, Adoption,
     Custody, Visitation rights, Care and protection.
     Department of Children & Families.  Practice, Civil, Care
     and protection proceeding, Adoption, Findings by judge.
     Evidence, Child custody proceeding.



     Petition filed in the Bristol County Division of the
Juvenile Court Department on March 31, 2016.

     The case was heard by Siobhan E. Foley, J.


     Dana C. Chenevert for the mother.
     Jared B. Cohen, Assistant Attorney General, for Department
of Children and Families.
     Hugh F. Ferguson for the child.

---

     [1] A pseudonym.

DITKOFF, J.  The mother appeals from a decree issued by a Juvenile Court judge terminating her parental rights to the child, approving the adoption plan of the Department of Children and Families (department), and granting her one posttermination visit per year.  We clarify that, when a child's mental health and behavioral needs are in flux, an adoption plan need not describe the kind of home environment and adoptive family makeup that ideally would best meet the child's particular needs when the child stabilizes enough to be adopted.  We conclude that the judge reasonably found that the adoption plan here was specific enough in these circumstances.  Further concluding that the trial judge properly found clear and convincing evidence of parental unfitness caused primarily by the mother's inadequately addressed mental health problems, which ultimately led her to abuse the child physically, and that the judge acted within her discretion in ordering one posttermination visit per year, we affirm.

1.  Background.  The mother has a long history with the department.  We, however, limit our discussion to the events since the birth of the child in August 2009.  In March 2010, the mother called the police to report that her former boyfriend (apparently the child's father), was calling and threatening to "destroy" her, and that there was a history of domestic violence

between them.[2]  In 2012, the mother was diagnosed with substance dependence disorder.

In July 2013, police responded to the mother's apartment after receiving a report that a woman was screaming.  The mother claimed that she had been "jumped" at a bar by a man and a woman for no apparent reason, and that some of her hair had been pulled out of her head.  During this interview, she slammed her cell phone on the kitchen table multiple times, claiming it was not charging.

In May 2014, a G. L. c. 119, § 51A, report (51A report) was filed regarding the child and her older sister, who is approximately twelve years older than the child, citing concerns of marijuana use in the home, supervisory issues with the child, and loud arguments with the older daughter.  Although the allegations were unsupported, the mother admitted to having screaming matches with her older daughter, and that these fights had an effect on the child.

In March 2016, the mother called the police from the child's elementary school, reporting that the child had "destroyed the classroom" by throwing things around the room. The mother claimed that the police officer she spoke to told her

---

[2] The department was unable to locate the child's father, and he never appeared at the trial.  The parental rights of "any unknown/unnamed father of" the child were terminated.

to give the child "a butt whipping," but that she did not follow the advice of the officer because the department would take the child away, pondering that "maybe [she] should have done it." Roughly two weeks later, on March 30, the principal of the child's school called the mother before school to discuss the child's recent problematic behavior, consisting of running through the halls, kicking the principal, and refusing to go to daycare or return home after school. At some point, the mother hung up and called back minutes later, stating that she "just beat the shit out of [the child]" and that she was "ready to give her up."[3] A child was crying in the background.

When the child arrived at school that day, dropped off by an unknown man, she was walking as if she was in pain. She stated that her mother hit her with a broom, and said that it hurt when she walked. She had a laceration on her lip and bruises "all over her body," in addition to marks on her face consistent with having been slapped, scratches on the back of her neck, and red areas on her arms. She had strong body odor and was not wearing underwear, her socks were full of holes, and her clothes were dirty. The child also stated that her mother punched her front tooth out and flushed it down the toilet, telling the child that the tooth fairy was not coming. The

---

[3] At trial, the mother denied making these statements.

department conducted an emergency removal on that date, and the child was taken to the hospital for further evaluation. She continued to report that her whole body hurt and became upset when she learned that blood had to be drawn, stating that she "hated" the nurses, that she could not breathe, and that they were choking her "like her mother." The mother was subsequently charged with assault and battery and later convicted by a jury.[4]

The day after her removal, the child disclosed that a man named "Greg," someone who had babysat her and visited her home, had "touched her pee-pee . . . numerous times," that he did the same to his own children, and that she was "afraid of him." She stated that she told her mother but that "her [m]other did not believe her." At the care and protection trial, the parties stipulated that the child later recanted her allegations of physical abuse at the hands of the mother and of sexual abuse at the hands of Greg.[5]

The mother has steadfastly denied hitting the child, and stated at trial that the allegations of physical abuse were devised by the school. The mother stated the tooth came out

---

[4] In 2020, a panel of this court affirmed the judgment, and the Supreme Judicial Court denied further appellate review.

[5] The parties stipulated so that the child would not have to testify. According to the police report, the child had been told by other children that she would never see her mother again and she explained to the forensic interviewer, "I miss my mom! I'm never going to see her ever again."

naturally when she removed a barrette from the child's mouth.[6] She denied that the child had any marks, bruises, or injuries from this incident.

Although the mother denied that she had a substance use disorder, she admitted to trying drugs and smoking marijuana.[7] The mother has been diagnosed with posttraumatic stress disorder (PTSD), and has experienced chronic depression for which she was hospitalized several times, both involuntarily and voluntarily. In spring 2019, she was hospitalized at an inpatient mental health treatment facility. The mother has consistently refused to sign releases for the department to speak with medical professionals about her treatment, with the exception of one of her therapists. She soon thereafter revoked that release.

In July 2016, the mother completed a parenting class, and started another to focus on children with attention deficit hyperactivity disorder (ADHD), one of the child's diagnoses, although she never completed it.[8] The mother testified that she

---

[6] The mother made disparate statements about what she did with the tooth. At a visit with the child, the mother said that she brought the tooth to the dentist. At another time, the mother stated that she told the child that she had flushed the tooth down the toilet and that the tooth fairy would not be coming, consistent with the child's account.

[7] The mother admitted to using cocaine as recently as 2018.

[8] When a social worker reminded her that she needed to take a class specific to the child's diagnosis, the mother stated that she was busy and did not care about the action plan.

did not believe in medications, and stated to the court investigator that she did not put the child on ADHD medication because she did not want the child to be "stigmatized or labeled."

The majority of the mother's parent-child visits went well. There were, however, some noteworthy exceptions. In April 2017, a social worker confronted the mother to tell her that an individual that she brought to a visit was a registered sex offender. The mother responded that she was not "judgmental about people," and that the individual had been victimized by his stepfather. She later texted the social worker, in relevant part, "[T]hank you for informing me . . . , I let him know he is not allowed in our lives even though I know the truth of his situation. Thanks."[9]

In June 2017, the mother and the child had a visit at a hair salon, at the mother's request, so that the child could get her hair done, even though the mother knew that the child screamed whenever her hair was touched; the mother stated that

---

[9] Shortly after this, the mother's visits were switched to biweekly instead of weekly. The day after they were switched, the mother sent the social worker a slew of text messages beginning at 5:22 A.M. Amongst her extensive comments, the mother stated, "Did you and your children sleep well last night because I didn't," "hey what the hell you don't care you got your kids living happily ever after," "my daughter is 7 years old, she got 2 boyfriends and you think it's funny, yeah it's cool," and "you're a loser." A different social worker was subsequently assigned to the family.

the child "needed discipline."  The child protested when the hairdresser cut her hair, and the mother picked up the hair clippings and said she was bringing them to court.  Although she was eventually able to console the child to get her to leave the salon, the mother stepped outside and yelled at an unidentified man, remarking that "this is fucking crazy."  Lastly, in February 2018, she gave the child a cell phone despite instructions from the department that the mother would have to wait until the foster family agreed to the child's having the phone.  Upon the social worker's inspection of the phone, she found several sexually explicit photographs of women.  After the social worker took the phone away, the child had to be transported by ambulance to the hospital for a crisis evaluation, and the mother's visits were suspended for six weeks.[10]

In November 2018, the mother's youngest daughter was born and removed by the department at birth, as her meconium tested positive for cocaine.  The mother reported that the youngest daughter's father had hit her throughout her pregnancy,

---

[10] In addition, in 2016 the mother told a social worker that the mother would, or did, tell the child that the mother went to jail because of the child's disclosure of abuse.  When the social worker told her that this was an inappropriate topic to discuss with a seven year old child, the mother stated that she did not care and that the child should know that "lies has consequences."

including on her "stomach."[11]  Nonetheless, the mother remained in a relationship with him, and continued to deny that any domestic violence occurred between them.  In March 2019, the mother was arrested and charged with solicitation.

The child has been diagnosed with reactive attachment disorder (RAD), PTSD, major depressive disorder, and ADHD. Although she was placed initially in a foster home, she was admitted to community-based acute treatment in February 2018 because of severe episodes of aggressive, unsafe behaviors.  In May 2018, it was determined that the child could no longer be maintained in a home environment, and she has been in residential care since then.  The child has an individualized education program (IEP) to address her "social-emotional needs," and, despite experiencing periods of stabilization, she "consistently has episodes of dysregulation."

On February 27, 2020, after a trial, the judge issued findings of fact and conclusions of law, in which she found the mother unfit, terminated the mother's parental rights, approved

---

[11] In March 2018, prior to the birth of the youngest daughter, police responded to an incident in which both the father of the youngest daughter and the mother claimed that each had been assaulted by the other.  Both parties were criminally charged.  The youngest daughter's father obtained a restraining order against the mother in the same month.  The youngest daughter is not involved in these proceedings.

the department's adoption plan, and granted the mother one posttermination visit per year. This appeal followed.

2. Standard of review. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Because termination of a parent's rights is an 'extreme step,' . . . a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992). "In making this determination, a judge must consider 'a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Adoption of Mary, 414 Mass. 705, 711 (1993). General Laws c. 210, § 3 (c), provides a nonexhaustive list of factors to be weighed in determining the fitness of a parent.

Where there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial deference to the trial judge's decision regarding the child's best interests and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993). An abuse of discretion exists where the decision "amounts to a 'clear error of judgment' that falls 'outside the range of reasonable alternatives.'" Adoption of Talik, 92 Mass. App. Ct. 367, 375 (2017), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

3. Unfitness and termination of parental rights. "[P]hysical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm." Adoption of Garret, 92 Mass. App. Ct. at 671, quoting Custody of Vaughn, 422 Mass. 590, 595 (1996). Contrary to the mother's suggestion that the judge failed to

address material evidence in relation to her conviction of assaulting and battering the child, the judge considered the fact that the child recanted her allegations of abuse, as well as the mother's persistent denials of abuse. It is, of course, not uncommon that a victim of domestic abuse denies the abuse. See Commonwealth v. King, 436 Mass. 252, 262 (2002) ("We recognize that victims of domestic violence often change their minds about whether to testify and whether to press charges in connection with a prior attack").

In addition to acknowledging the fact that a jury determined beyond a reasonable doubt that the mother had beaten the child, the judge examined the initial report of the incident and the statements the child made to a court investigator, reviewed the record of the child's injuries, and considered the mother's own prior statement that she "beat the shit" out of the child in reasonably concluding that the mother abused the child. Although "evidence of prior criminal convictions will not be conclusive of parental unfitness in every case[,] . . . [t]o the extent it bears on fitness, . . . evidence of prior convictions may properly be weighed in the balance." Care & Protection of Frank, 409 Mass. 492, 495 (1991). Cf. Adoption of Garret, 92 Mass. App. Ct. at 673 (mother's guilty plea to criminal charges

brought against her for child abuse probative of unfitness to parent children not directly subjected to abuse).[12]

The judge reasonably concluded that the mother's failure to address her mental health concerns properly perpetuated the issues that brought the child into the department's custody. "Mental disorder is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs." Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. 1, 9 (1989). The mother's continuous struggle with her mental health has had a lasting effect on the child. Presumably, the mother's mental health issues led to the incident of abuse that precipitated the child's removal. As the judge reasonably found, the "[m]other's untreated mental health was a significant factor resulting in her losing her temper, losing control and beating her daughter in March of 2016." Weeks before the allegations of physical abuse came to light, the mother called the police to report that her six year old daughter threw things around her classroom. During a discussion

---

[12] In making the ultimate determination of unfitness, the judge did not rely on the child's allegation that she was sexually abused by a man who had supervised her. Although the judge mentioned this potential abuse in passing, she determined that the factor of "severe or repetitive conduct toward the child or another child in the home of a physically, emotionally or sexually abusive or neglectful nature" under G. L. c. 210, § 3 (c) (ix), applied only "in regards to physical abuse."

with the school principal, the mother stated that she "just beat the shit" out of the child and that she was "ready to give her up." In several of her visits with the child, the mother demonstrated an inability to recognize the inappropriateness of her actions. For example, she brought a registered sex offender to a visit and fixated on the child's hair, knowing that the child screamed when her hair was touched. The hair salon visit, along with the visit during which the mother provided an unauthorized cell phone to the child containing naked photographs of women, resulted in the child's dysregulation, and in one instance required a transport by ambulance for a crisis evaluation.

The mother's reluctance to utilize medications to treat her own mental health diagnoses affected the child, especially when the mother decided to decline ADHD medication for the child because she thought it would stigmatize the child. Moreover, the mother continuously failed to provide releases to the department to speak with her doctors, refused to provide the department with a psychological evaluation that she completed, and checked herself in and out of inpatient facilities but failed to maintain consistency with treatment throughout the case. See Adoption of Luc, 484 Mass. at 146-147, quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) (mother's "fail[ure] to

recognize the need for or to engage consistently in treatment," and failure to provide the department with psychological evaluation was "relevant to the determination of unfitness").[13] The mother's consistent failure to address her mental health issues provided substantial support for the judge's conclusion that her unfitness was likely to continue indefinitely.

Additionally, in determining parental unfitness, the judge considered factors such as the mother's possible substance use disorder and the domestic violence and tumultuous relationships in which she had continuously involved herself. The mother's possible substance use disorder was referred to in passing in the judge's conclusions of law, but was not a focal point of her decision. Although the mother is correct in stating that any alleged substance use did not overtly affect her parenting of the child, the judge reasonably considered it as a contributing

---

[13] The mother takes issue with her service plans, arguing that they were not specifically tailored to meet her needs and failed to identify a particular type of service that would best assist her. This contention is without merit. Her service plans, among other things, instructed her to "[c]omplete a psychological evaluation to accurately identify current mental health issues," "gain a better understanding of [the child's] diagnosis of ADHD," participate in "therapeutic support services such as individual therapy and home-based therapy," and "[d]emonstrate the ability to communicate with" her children without "using threatening language, yelling nor by using any type of physical disciplining." It was precisely the mother's refusal to share a psychological evaluation with the department that prevented the department from further tailoring the service plans to her needs.

factor to the mother's "depression, anger, and volatile nature," which rendered her unfit.[14]

The domestic violence that has infected the mother's life was also a proper factor for the judge to consider in determining unfitness. In addition to the mother's domestic violence against the child, the judge found a pattern of domestic violence that the mother experienced as both a perpetrator and a victim. In May 2014, after a 51A report was filed alleging loud arguments with her oldest daughter, the mother admitted that these fights, consisting of yelling and screaming, and sometimes resulting in a police response, had an effect on the child. Additionally, the mother had a history of domestic violence in both her romantic and platonic relationships, including her relationship with her current boyfriend. Although she admitted that there was domestic violence within that relationship in the past, and charges had been filed against both of them stemming from allegations of

---

[14] For example, in October 2017, the mother was observed "nodding off" and had slurred speech, making no sense while speaking to a social worker at the Juvenile Court. When the social worker suggested the mother obtain a substance evaluation and engage in services, she denied any use of substances. She also failed to complete her service plan task of participating in a substance evaluation. Despite her diagnosis in 2012 of "substance dependence disorder," the mother denied she had ever had such a problem and did not feel related services were necessary. In 2018, her youngest daughter was born with meconium testing positive for cocaine.

assault in addition to a restraining order filed against the mother by the boyfriend, she subsequently denied that any domestic violence occurred between them, and planned to stay in a relationship with him going forward. See Adoption of Zak, 87 Mass. App. Ct. 540, 543 (2015), S.C., 90 Mass. App. Ct. 840 (2017), quoting Custody of Vaughn, 422 Mass. at 599 ("witnessing domestic violence, as well as being one of its victims, has a profound impact on children"). Contrast Adoption of Posy, 94 Mass. App. Ct. 748, 754 (2019) (clearly erroneous for judge to conclude father had "longstanding issues of domestic violence" where no abuse prevention order was filed against father, there was firm denial of abuse by both mother and father, and there were no police reports documenting response to domestic violence). Accordingly, evidence of domestic violence was not stale, as the mother suggests. Contrast Adoption of Rhona, 57 Mass. App. Ct. 479, 486 (2003), S.C., 63 Mass. App. Ct. 117 (2005) ("The passage of four years is too long a period to rely on the predictive value of past behavior without verification -- especially when evidence contradicting the prediction is readily available" [footnote omitted]). Rather, the mother's consistent failure to address these issues supported the judge's conclusion that her unfitness would continue indefinitely.

4. Adoption plan. a. Generally. "In determining the best interests of the child, the judge must consider, among

other things, 'the plan proposed by the department.'" Adoption
of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting G. L.
c. 210, § 3 (c).  "The judge also must consider parental
nominations of caretakers and then determine which placement
will serve the best interests of the child."  Adoption of Dora,
52 Mass. App. Ct. 472, 474-475 (2001).  The plan does not need
to be "'fully developed' in order to support a termination
order, but it must provide 'sufficient information about the
prospective adoptive placement "so that the judge may properly
evaluate the suitability of the department's proposal."'"
Adoption of Varik, supra, quoting Adoption of Willow, 433 Mass.
636, 652 (2001).  To determine the sufficiency of the plan, the
judge may consider evidence and testimony "regarding unfitness
and the child's best interests, in addition to the written
plan."  Adoption of Varik, supra.  The judge's determination
that a particular plan is in the child's best interests
"presents 'a classic example of a discretionary decision' to
which we accord substantial deference."  Adoption of Jacob, 99
Mass. App. Ct. 258, 272 (2021), quoting Adoption of Peggy, 436
Mass. 690, 705, cert. denied sub nom. S.T. v. Massachusetts
Dep't of Social Servs., 537 U.S. 1020 (2002).

     b.  Competing plans.  There were three placement plans
proposed at the trial.  The mother proposed two maternal great
aunts (hereinafter, maternal aunts or maternal aunt) for

guardianship, and the department had its own written plan. The first maternal aunt lived in the city of Lowell with her husband and mother-in-law. She contacted the department in 2017 to be considered as a placement for the child, but a home study was not completed as her husband expressed that he did not want the child in the home. The department considered her again the following year and again had concerns, primarily with the husband.

The second maternal aunt lived in Lowell with three of her grandchildren, ranging in age from three to eight years. All of the grandchildren were in therapy and suffered from the effects of "abuse and neglect." One of these grandchildren was diagnosed with RAD and PTSD.

Finally, the department's written plan described the child's "significant mental health and behavioral needs" in some length. The plan discussed the first maternal aunt and stated that she "should be very carefully screened should she apply again."[15] Next, the plan set out the intention to initiate an Interstate Compact for the Placement of Children case with a third maternal aunt in Texas once the child "has made adequate progress in the group home and is getting ready to step down to

_____

[15] The plan did not address the second maternal aunt, presumably because she was first brought to the attention of the department several months after the department created the plan.

a lower level of care."  The plan also expressed the possibility of the child's older sister serving as guardian, although she did not meet residency requirements at the time the plan was written.  The plan then indicated that the former foster family wanted to be explored as an adoptive resource.  The plan provided that, if none of the child's "relatives or former foster parents" were approved, the department would seek adoption by recruitment, and the recruitment worker would "attempt to match this child with an appropriate waiting adoptive family that has been approved by [the department]."  The plan went on to describe the various methods available to recruit an adoptive family.

c. Kinship adoption plans.  The judge acted within her discretion in finding that placement with either of the two maternal aunts proposed by the mother was not in the best interests of the child, at least at the time of the termination.  As to the first maternal aunt, there were unresolved issues about her husband's willingness to support the child.[16]  With respect to the second maternal aunt proposed by the mother, there were concerns that she might find the child's needs

---

[16] The first maternal aunt testified that she was willing to go to classes and fill out "packets," but when asked if her husband would be willing, she stated, "I don't usually make him go to things.  I'm willing to do it for us."  When asked again whether her husband would be willing to take classes to get custody of the child, she said, "I wouldn't even ask him."

difficult to meet, as there was another child in the home who was diagnosed with RAD and PTSD, and the two other children living in the home had "trauma histories of their own." Considering that the department plan does not foreclose adoption by either of the maternal aunts when the child stabilizes, the judge acted within her discretion in finding that neither placement was in the best interests of the child at the time.[17]

d. Sufficiency of the department's plan. The mother argues that the department's plan is deficient. In Adoption of Varik, 95 Mass. App. Ct. at 771, we held that the plan must "specify the type of adoptive parents and the characteristics of the home environment best suited to meet [the child's] specific needs." See Adoption of Lars, 46 Mass. App. Ct. 30, 32 (1998), S.C., 431 Mass. 1106 (2000) (plan deemed adequate which recommended recruitment of, in consideration of further child-specific details, "one or two-parent family who are trained or have knowledge in special needs and are specifically capable of dealing with children who have neurological and developmental

---

[17] As the process continues, if either of the maternal aunts proposed by the mother continues to express interest in adopting the child and advances to the preadoptive stage, we expect that the department will meet with her and inform her about the child's diagnoses and behavioral concerns, assuming she has not already been so informed. See DCF Permanency Planning Policy, Achieving Permanency through Adoption, at 38 (2013) (during disclosure meeting, "the identified pre-adoptive family is provided with all required adoption information and disclosure material regarding the child").

delays, along with [ADHD] and [PTSD]," and "have no more than two children and [are] willing to continue postadoption sibling contact").  We did not, however, mean to suggest that this information is always necessary for a plan to be sufficient.

In Adoption of Varik, 95 Mass. App. Ct. at 765, the child's behavioral issues had largely stabilized by the time of trial, such that he "was doing well academically, was medically up-to-date, and had graduated from an after-school mentoring program." He was "consistently engaged in therapeutic counselling treatment, and the department had made a referral for him to resume services with his former therapeutic mentor."  Id.  In those circumstances, it was reasonable to require the department to provide a description of "the kind of home environment and adoptive family makeup that ideally would best meet [the child's] particular needs."  Id. at 771.

Here, by contrast, the child's mental health and behavioral issues were very much in flux.  In such a situation, it was reasonable -- and indeed prudent -- to allow for flexibility in the plan.  In that regard, the written plan discussed in detail the child's mental health and behavioral needs.  It indicated that she "has significant mental health and behavioral needs that impact her daily functioning.  [She] often dysregulates and has become aggressive toward her foster family members, including kicking and throwing objects. . . .  [H]er level of

dysregulation and aggressive, unsafe behavior became so extreme that her needs could not be met in a home environment." The plan set out the child's diagnoses of RAD, PTSD, major depressive disorder, and ADHD, and discussed at length the treatment that she had received. Additionally, the plan discussed her IEP and stated that, although she "had a positive start to the 2018/2019 school year," she had "several bouts of dysregulation" that "have led to multiple evaluations by crisis." What the plan could not do is describe what special needs the child would still have once she stabilizes enough to be placed for adoption.

The judge acted within her discretion in finding that the department's proposed adoption plan served the best interests of the child and had, in these circumstances, "enough detailed and specific information to properly evaluate its suitability for [the child]." The judge delayed issuing the decree, "hoping to re-open the evidence" to hear what the child's preferences were, but the child remained too unstable to voice her preferences. Additionally, the judge immediately scheduled the case sixty days from the filing of the decision for "a report from [the department] as to movement towards its goal and possible identified adoptive resources." These were proper actions for the judge to take. See Adoption of Jacob, 99 Mass. App. Ct. at 274, quoting Adoption of Cadence, 81 Mass. App. Ct. 162, 170-171

(2012) ("the judge took extra steps to oversee the department's recruitment efforts. Rather than wait twelve months for the mandatory review of the department's permanency plan . . . the judge retained jurisdiction and ordered the department to report to her every thirty days . . . . The judge did not 'merely . . . issue a broad dispositional order committing the child to the department's custody'").

In these circumstances, attempting to define the adoption plan too precisely risked unnecessarily limiting the adoption options once the child stabilizes. It is possible that some, if not many, of the child's current difficulties will resolve with further treatment. A plan designed for the child as she is now could well require resources and conditions that will prove unnecessary when the child is ready for adoption. Indeed, a too-specific plan at this time might well rule out the kinship adoption options propounded by the mother, even though those options may be suitable in the future. In consideration of "the fluidity of [the child's] mental health," we agree with the judge that "it is difficult, if not impossible, to be precise as to what will best suit her needs upon discharge from her current residential treatment program." See Adoption of Paula, 420 Mass. 716, 722 n.7 (1995) ("With the future status of the children unclear pending the outcome on the petitions under G. L. c. 210, § 3, the department could not do more than outline

in general terms its plans for the children. A fully developed adoption plan, while preferable, is not an essential element of proof in a petition brought by the department under G. L. c. 210, § 3"). Despite this difficulty, in its adoption plan, the department extensively detailed the child's diagnoses and treatment, and described several child-specific resources that may be appropriate for her once she is in a position to be adopted. In these circumstances, this was a sufficient plan for the child.

5. Posttermination visitation. A trial judge's decision whether to order visitation between a child and a parent whose parental rights have been terminated is reviewed for an abuse of discretion. See Adoption of Ilona, 459 Mass. at 66. "In determining whether to exercise the authority to order visitation, a judge must ask two questions: First, is visitation in the child's best interest? Second, in cases where a family is ready to adopt the child, is an order of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?" Id. at 63.

At the outset, the judge did not ignore the evidence of a bond between the child and the mother, as the judge ordered one supervised visit per year, finding it in the child's "best interest to have post-termination/adoption contact with her

[m]other."[18]  It is of no matter that this was fewer than the department's recommendation at trial, as the judge was not bound by the department's recommendation, and the child's custodian remains free to allow additional visits if the custodian determines that they are in the child's best interests.  See Adoption of Douglas, 473 Mass. 1024, 1028 (2016) (no abuse of discretion where department proposed children have visits with mother but judge declined to order visitation as not in children's best interests).  "[T]he purpose of such contact is not to strengthen the bonds between the child and [her] biological mother or father, but to assist the child as [she] negotiates, often at a very young age, the tortuous path from one family to another."  Id., quoting Adoption of Vito, 431 Mass. 550, 564-565 (2000).  Accord Adoption of Virgil, 93 Mass. App. Ct. 298, 307 (2018), quoting Adoption of Terrence, 57 Mass. App. Ct. 832, 839 (2003) ("posttermination visitation 'must be grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent [or] the legal consequences of their natural relation'").

---

[18] On appeal, the child argues that the decree should be affirmed, including the visitation order.

Here, the judge acted within her discretion in determining that one court-ordered visit per year was appropriate. As the matter progressed, the mother became less and less consistent with visits. In 2016 through the first half of 2017, the mother consistently visited the child. In August 2017, she asked for no visits because she was voluntarily admitting herself into an inpatient program for her mental health. Her next visit with the child was in November 2017. She canceled her visits in December 2017 and January 2018. Visits resumed in February 2018, but were suspended for six weeks because of the cell phone incident, which sent the child into crisis. After the six-week suspension, the social worker attempted to schedule a visit with the mother, but she was difficult to contact, and she did not schedule another visit until October 2018. In November 2018 through January 2019, visits were canceled or suspended through no fault of the mother, because of concerns for the child's mental health. After the last suspension period, the mother did not schedule another visit with the child up to the date of trial. Where the child's emotional state was precarious, and the mother's visits were inconsistent and, in some instances, inappropriate, the judge acted within her discretion in finding a bond between the mother and child, but concluding that requiring one court-ordered visit per year was in the child's best interests.

<u>Decree affirmed</u>.